# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| DOMAIN PROTECTION, LLC, | § | |
| | § | |
| v. | § | Civil Action No. 4:18-cv-792 |
| | § | Judge Mazzant |
| SEA WASP, LLC, ET. AL. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

The procedural history in this case is needlessly complicated. Plaintiff Domain Protection, LLC filed a Motion for Preliminary Injunction (Dkt. #54), seeking to stop Defendant Sea Wasp, LLC from locking its access to domain names in its possession. The corresponding response and reply were timely filed but a sur-reply was not. Sea Wasp subsequently filed two motions seeking leave to file a sur-reply (Dkt. #79; Dkt. #83) and one to file additional briefing (Dkt. #120). Domain Protection opposes these efforts, and moves to strike one of the motions for leave (Dkt. #81).

While the Court does not appreciate Sea Wasp's failure to timely file its briefs, in the interest of justice, the Court will consider Sea Wasp's late-filed briefs nevertheless. After all, the motion is being decided without a hearing, where Sea Wasp may have raised these arguments. *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (quoting *Commerce Park at DFW Freeport v. Mardian Constr. Co.*, 729 F.2d 334, 342 (5th Cir. 1984)) ("If no factual dispute is involved, however, no oral hearing is required; under such circumstances the parties need only be given 'ample opportunity to present their respective views of the legal issues involved.'"). The Court has thus considered all pleadings filed in connection with the motion for preliminary injunction, which will be granted.

# BACKGROUND[1]

The internet is "an electronic communications network that connects computer networks and organized computer facilities around the world." *Internet*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/Internet (last visited July 11, 2019). To access a website, users must connect their home computer to the one hosting the site. This is done by typing the website's "Internet Protocol Address" (the "IP Address")—a string of numbers that identifies the computer where the website is housed—into Internet Explorer or another web browser. *See IP Address*, TECH TERMS COMPUTER DICTIONARY, https://techterms.com/definition/ip_address (last visited July 11, 2019) (listing "67.43.14.98" as an example). Because an IP address may be difficult to remember, website owners typically obtain an alpha-numeric "domain name" that users can type reach to their website and that might be easier to remember, such as "google.com." Put simply, an "IP address," is comparable to a nine-digit phone number and a "domain name" is comparable to the name saved on a cell phone for that number.

A party can secure the rights to use a particular domain name in one of two ways. It can register a brand-new domain name with a "registrar," the party responsible for maintaining the registration of domain names. Or, it can purchase an existing domain name from the party who has registered that name—also known as the "registrant" or "registered name holder." Registered name holders can earn money from the domain names in their possession by selling them or directing them to placeholder sites where ads are placed and monetized.

---

[1] The background section is based on the undisputed facts reflected in the record, which includes evidence that may be proper to consider on this motion but not at trial. *See Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993) (explaining that "a district court may issue a preliminary injunction without an evidentiary hearing when the facts are not in dispute. Furthermore, at the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence.") (citation omitted).

Domain Protection is the registered name holder for over 50,000 domain names (the "Domain Names") while Sea Wasp is the registrar over those names. This suit concerns whether Sea Wasp is encroaching on Domain Protection's proprietary interest in the Domain Names by placing an executive lock on them, which prevents Domain Protection from selling the Domain Names or updating their registration information. Sea Wasp insists that Domain Protection lacks any proprietary interest in the Domain Names in light of a dispute over their ownership.

A summary on how Domain Protection came into possession of the domain names may be helpful at this point. In 2014, three parties filed suit in the Northern District of Texas against Jeffrey Baron and one of his companies for misappropriating their domain names. The court found Baron to be a vexatious litigator and, on this basis, appointed a receiver over his assets while the dispute was pending (Dkt. #54, Exhibit 15). The court also appointed a receiver (the "Receiver") over assets belonging to Novo Point, LLC ("Novo Point") and Quantec, LLC ("Quantec") (collectively, the "LLCs'") two limited liability companies with ties to Baron (Dkt. #54, Exhibit 13). The LLCs' assets included the Domain Names. They were handed over to the Receiver as a result.

Baron argued that the court lacked jurisdiction to enter the receivership order, and the Fifth Circuit agreed. This prompted the district court to unwind the receivership (the "Unwind Order") (Dkt. #54, Exhibit 17). Assets held in Baron's name would be returned to him. But it was not apparent whom to return the LLCs' assets to in light of a dispute over who could properly act for them. Without resolving the dispute, the court directed the Receiver to return the Domain Names to Lisa Katz, the Local Operations Manager for the LLCs. Katz was entrusted to manage the LLCS' assets, including the Domain Names, until the dispute over control of the LLCs was resolved (Dkt. #54, Exhibit 14 at pp. 4–5 n.2; Dkt. #54, Exhibit 17).

Baron-affiliates Mike Robertson and David McNair (the "Baron Affiliates") tried to induce the registrar over the Domain Names, fabulous.com ("Fabulous"), into giving them control of the Domain Names anyway. But the Receiver intervened, instructing Fabulous to handover the Domain Names to Katz, pursuant to the Unwind Order (Dkt. #54, Exhibit 17). Katz then assumed control over the Domain Names. The LLCs had racked up substantial debt while they were under receivership and that "creditors threatened to place the LLCs in bankruptcy for liquidation." (Dkt. #54, Exhibit 31 at p. 2). To prevent this, Katz assigned the Domain Names to Domain Protection, a company where she is also manager, which was to liquidate the Domain Names as needed to pay off the LLCs' debts (Dkt. #54, Exhibit 31 at p. 2). But, around this time, Baron had filed suits in Texas and Australia challenging Katz's possession of the LLCs' assets. This prompted Fabulous to place an "executive lock" on the Domain Names while these actions were pending, which prevented Domain Protection from liquidating the Domain Names while the suits were ongoing.

Neither suit was successful (Dkt. #54, Exhibit 9; Dkt. #54, Exhibit 12). In August 2017, after the suits had been dismissed, Domain Protection asked Fabulous to restore its access to the Domain Names. Sea Wasp purchased Fabulous around that time. While the Parties dispute what immediately followed, they agree that, "[a]t least between January 28, 2018 to February 11, 2018, there was not an 'Executive Lock' on the [D]omain [N]ames." (Dkt. #42 at p. 1). Domain Protection began managing the affairs over the Domain Names shortly after. It started by replacing Bidtellect as the advertisement revenue management company for the Domain Names on receipt a "concerning" letter from Bidtellect (Dkt. #54 at p. 10). Bidtellect was apparently exasperated with the series of disputes over the Domain Names and proposed certain non-negotiable terms to continue their contractual relationship. Domain Protection responded by terminating its contract

with Bidtellect, contracting with a new advertisement revenue management company, and updating the registration information for the Domain Names accordingly.[2] This meant that, when a user typed a Domain Protection domain name in a web browser, the user would be directed to a placeholder website hosted by the new advertisement revenue management company.

By late February 2018, two or three weeks after the lock was removed, Baron filed another suit (the "Underlying Dispute") challenging Katz's authority to transfer the Domain Names. *See In re Payne*, No. 16-04110 (Bankr. E.D. Tex. 2018). Domain Protection believes that Baron filed this suit simply to lock the Domain Names indefinitely, citing correspondence from Baron's attorneys (*see* Dkt. #54, Exhibit 28). Sure enough, Sea Wasp responded by reverting the changes Domain Protection had made to the Domain Names' registration information and turning the executive lock back on. Domain Protection notes that Robertson, one of the Baron Affiliates who tried to take control of the Domain Names in violation of the Unwind Order, is now a principal or "key person" at Sea Wasp (Dkt. #54, Exhibit 31 at pp. 3–4).

Domain Protection has brought claims against Sea Wasp for respective violations of the Texas Theft Liability Act and the Stored Communications Act, interference with contract, civil conspiracy, and conversion. Domain Protection alleges that, by turning the lock back on, Sea Wasp is encroaching on its proprietary interests in the Domain Names since it cannot transfer them or update their registration information. Sea Wasp, however, insists that it can and must place a lock on the Domain Names while a dispute is pending, citing its obligations as a registrar accredited with the Internet Corporation for Assigned Names and Numbers ("ICANN"). ICANN-registrars must comply with the Registrar Accreditation Agreement (the "Accreditation Agreement"), which instructs them to maintain the status quo once a dispute arises (Dkt. #54,

---

[2] This would involve changing the "nameserver records" affiliated with the Domain Names.

Exhibit 2 at p. 5). According to Sea Wasp, this means that it cannot allow Domain Protection to transfer the Domain Names while a dispute is pending. Domain Protection counters that ICANN's dispute resolution policy requires registrars to transfer domain names on "written or appropriate electronic **instruction from [the registrar] to take such action**"—even after a dispute has started (Dkt. #54, Exhibit 2 at p. 5) (emphasis in original).

Domain Protection now seeks a preliminary injunction, contending that it will suffer "irreparable harm" if it cannot sell or monetize the Domain Names. Domain Protection has $2,000 in its account, cannot afford to pay renewal costs for all of the Domain Names, and cannot receive emails since the Domain Names are directed to a site hosted by Bidtellect—the advertising manager whose contract Domain Protection had terminated.

## LEGAL STANDARDS

A party seeking a preliminary injunction must establish the following elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiffs will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "A preliminary injunction is an extraordinary remedy and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Id.* Nevertheless, a movant "is not required to prove its case in full at a preliminary injunction hearing." *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1985) (quoting *Univ. of Tex. v. Comenisch*, 451 U.S. 390, 395 (1981)). The decision whether to grant a preliminary injunction lies within the sound discretion of the district court. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

**DISCUSSION**

## I.      The Status Quo

Sea Wasp argues that the Court should deny Domain Protection's request for a preliminary injunction because it seeks to modify the status quo. As an initial matter, a party may seek a preliminary injunction that alters the status quo—though such requests are disfavored and require a stronger showing from the plaintiff. *See Justin Indus., Inc. v. Choctaw Secs., L.P.*, 920 F.2d 262, 268 n.7 (5th Cir. 1990) (explaining that plaintiffs seeking such relief must "show[] a clear entitlement to the relief under the facts and the law").

Domain Protection is not seeking to alter the status quo, regardless. The Fifth Circuit has long held that, for purposes of a preliminary injunction, the status quo refers to the "last uncontested status of the parties." *Yeargin Const. Co. v. Parsons & Whittemore Ala. Mach. & Servs. Corp.*, 609 F.2d 829, 831 (5th Cir. 1980) (citing *Wash. Capitols Basketball Club, Inc. v. Barry*, 419 F.2d 472, 476 (9th Cir. 1969)).[3]  The Fifth Circuit's decision in *Lake Charles Diesel, Inc. v. Gen. Motors Corp.* is illustrative. 328 F.3d 192, 193–95 (5th Cir. 2003). There, the defendant purported to terminate a contract for the sale of automotive repair parts, prompting the plaintiff to sue and move for a preliminary injunction. The Fifth Circuit found that the plaintiff's attempt to nullify the purported contract termination did not amount to a change in the status quo. *Id.* at 196. The Fifth Circuit reasoned that, by nullifying the contract termination, the district court was merely maintaining the status quo—the continuation of the contract. *Id.* That is, the Fifth

---

[3] *See also Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1194 (5th Cir. 1974) (quoting *Minn. Mining and Mfg. Co. v. Meter*, 385 F.2d 265, 273 (8th Cir. 1967)) ("We agree with the Eighth Circuit that the status quo to be preserved 'is the last uncontested status which preceded the pending controversy.'"); *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) ("If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury.") (citations omitted).

Circuit recognized the last uncontested status of the parties' relations leading up to the suit *as* the status quo. *See id.*

Domain Protection seeks to maintain the last uncontested status leading up to the dispute here. The Parties agree that: (1) the Domain Names were subject to an executive lock while the suits in Texas and Australia were pending; (2) the executive lock was removed for a (short) period after these suits were dismissed, which allowed Domain Protection to make certain changes to the Domain Names' registration information; (3) Sea Wasp reversed the changes and placed the lock back on after the Bankruptcy Court action was initiated; and (4) Domain Protection responded by filing this suit and motion. The last uncontested status, then, is the period in which no lock had been placed on the Domain Names. Because Domain Protection is not attempting to modify the "status quo," the Court will not apply the stricter standard applicable to motions for preliminary injunction seeking to do so.

## II. Substantial Likelihood of Success

A plaintiff seeking a preliminary injunction must present a prima facie case of his substantial likelihood to succeed on the merits. *Health Scis., LLC v. Vascular Health Scis.*, 710 F.3d 579, 582 (5th Cir. 2013) (citing *Janvey v. Alguire*, 647 F.3d 585, 595–96 (5th Cir. 2011)). This does not require the plaintiff to establish its entitlement to summary judgment. *See Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009). The plaintiff, instead, must only "present a prima facie case." *Daniels Health*, 710 F.3d at 582.

Domain Protection has met this standard as to its claim for violation of the Texas Theft Liability Act (the "TTLA").[4] The TTLA provides a civil cause of action for theft, as defined by

---

[4] Each of Domain Protection's causes of action are based on the premise that Sea Wasp has encroached on its interest in the Domain Names. As a result, Domain Protection may also be substantially likely to succeed on those claims on the same basis. But the Court does not need to decide whether this is the case. *See Planned Parenthood Gulf Coast,*

the Texas Penal Code. TEX. CIV. PRAC. & REM. CODE §§ 134.002, 134.003. Under the Texas

Penal Code, a party engages in "theft" by "unlawfully appropriating property with intent to deprive

the owner of property," TEX. PENAL CODE § 31.03, and "appropriates" property by transferring,

acquiring, or exercising control over it. *See* TEX. PENAL CODE § 31.01(4).

Sea Wasp insists that it could not have appropriated Domain Protection's property since

(1) Domain Protection cannot establish that it is the rightful owner of the Domain Names and, even

if it could, (2) Sea Wasp has the authority to place a lock on the Domain Names while a dispute is

pending.[5] The Court disagrees.

### a. Domain Protection's Proprietary Interest in the Domain Names

Texas courts have long held that a party may bring a TTLA claim against another based

merely on its *possession* over the property in question. After all, Texas theft laws are meant to

"protect all ownership interests in property"—and not simply full ownership. *Freeman v. State*,

707 S.W.2d 597, 603 (Tex. App.—San Antonio 1986) (en banc) ("The issue of 'ownership' goes

to the scope of the property interest protected by the law and is intended to protect all ownership

interests in property from criminal behavior. When there are equal competing possessory interests

---

*Inc. v. Kliebert*, 141 F.Supp.3d 604, 636 (M.D. La. 2015) (citing *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of America*, 549 F.3d 1079, 1096 (7th Cir. 2008)) ("If Plaintiffs satisfy the elements needed to show a substantial likelihood of success on the Individual Plaintiffs' Section 1396a(23) claim only, so long as the other factors are met, a preliminary injunction is appropriate.").

[5] To establish a TTLA claim at trial or on summary judgment, Domain Protection must show that Sea Wasp intended to deprive Domain Protection of the Domain Names. But, because Sea Wasp has not challenged this element, this argument and any other unraised arguments that may impact Domain Protection's chances to succeed on the merits have been waived on this motion. *See Audler v. CBC Innovis Inc.*, 519 F.3d 239, 255 (5th Cir. 2008) (quoting *Castro v. McCord*, 259 F. App'x 664, 665 (5th Cir. 2007)) ("A party 'waives an issue if he fails to adequately brief it.'"). Domain Protection has met its prima facie burden to show intent regardless. Domain Protection provides evidence indicating that (1) it objected to Sea Wasp's decision to lock the Domain Names (Dkt. #54, Exhibit 7), (2) its objections were disregarded (Dkt. #54, Exhibit 6), and (3) Sea Wasp is at least partially owned and/or run by Robertson, someone with ties to Baron who had previously tried to secure the Domain Names on behalf of Baron—in violation of the Northern District of Texas' Order to return the Domain Names to Katz after the Receivership ended (Dkt. #54, Exhibit 31 at pp. 3-4). To the extent there is evidence or arguments raised later that may prevent Domain Protection from succeeding on its TTLA claim, or any other claim, the Court will address these items at other stages in this litigation if they are properly raised at that time.

in property allegedly stolen, we believe that the key to answering the question of which person has the greater right to possession of the property is who, *at the time of the commission of the offense,* had the greater right to possession of the property.") (emphasis in original).

Sea Wasp insists otherwise. It notes that, when defining theft, the Penal Code makes multiple references to the "owner of the property." *See* TEX. PENAL CODE § 31.03. According to Sea Wasp, this means that the Penal Code only protects the rights of full owners. The Court is unconvinced. The Texas Penal Code expressly applies to a range of proprietary interests, from "title" to "nonpossessory." *See* TEX. PENAL CODE § 31.01(4) (explaining that "appropriate" refers to the "transfer or purported transfer of title to *or other nonpossessory interest in* property," among other things). Domain Protection thus needs to show only that it "owns" *some* proprietary interest in the Domain Names and that Sea Wasp is appropriating that interest. *See Manning v. State*, 68 S.W.3d 697, 698 (Tex. Crim. App.—Corpus Christi 2000, *pet. ref'd*) (citing *Easton v. State*, 533 S.W.2d 33, 35 (Tex. Crim. App. 1976)) ("The State can prove ownership in three ways: (1) by showing title, (2) by proving possession, or (3) by showing that the alleged owner has a greater right to possession than the defendant.").

Domain Protection, plainly, has some proprietary interest in the Domain Names. As explained, a different court had previously appointed a receiver over Baron's assets, including assets belonging to the LLCs. When it came time to unwind the receivership, the court directed the LLCs' assets to be returned to Katz as the Local Operations Manager for the LLCs. Katz then agreed to assign the Domain Names to Domain Protection. This makes Domain Protection the party in possession of the Domain Names.

Sea Wasp notes that there has been (and continues to be) litigation over the ownership of the Domain Names that it believes Domain Protection should lose—its professed neutrality in the

Underlying Dispute apparently notwithstanding. Sea Wasp argues that Katz was merely holding the Domain Names in some nominal capacity for the LLCs and lacked authority to transfer them. The Court disagrees. The Northern District of Texas makes clear that, while disputes over their control were pending, Katz had the "authority to manage the LLCs and their assets" (Dkt. #54, Exhibit 14 at p. 5)—not that Katz was holding the Domain Names nominally. It follows that Katz could dispose of the Domain Names. After all, entities are necessarily run by individuals serving as their agents. *See Fields v. State*, No. 11-07-00095-CR, 2008 WL 4356367, at *1 (Tex. App.—Eastland 2008, *no pet.*) (citing *Johnson v. State*, 606 S.W.2d 894, 895 (Tex. Crim. App. 1980); *Manning*, 68 S.W.3d at 698) ("A person acting on behalf of a corporation, with managerial authority and responsibility over its goods, is the effective owner."). And the undisputed evidence reflects that Katz transferred the Domain Names in her capacity as an agent for the LLCs' here. In a sworn statement, Katz explains that she transferred the names to pay off *the LLCs'* creditors.

Additionally, despite all of the litigation concerning the Domain Names, Sea Wasp has not identified a single order finding that the Northern District was wrong to return the Domain Names to Katz or that Katz was wrong to transfer the Domain Names to Domain Protection. And it is surely not the Court's place to decide the outcome of this litigation. *See United States v. Tex. Tech. Univ.*, 171 F.3d 279, 286 (5th Cir. 1999) (discussing "the well-established principle that the federal courts may not issue advisory opinions"). Until a court finds otherwise, the Court must presume that the Northern District properly returned the names to Katz, *see Cocke, for Use of Commercial Bank of Commerce v. Halsey*, 41 U.S. 71, 87 (1842) (explaining that orders are binding until they are overturned), and that Domain Protection's possession is lawful, *see* CLIFFORD S. FISHMAN & ANNE T. McKENNA, 2 JONES ON EVIDENCE § 10:18 (7th ed. 2019) (citing *Reiter v. Coastal States*

*Gas Producing Co.*, 382 S.W.2d 243, 252 (Tex. 1964), among other cases) ("A person in possession of property is presumed to lawfully possess it.").

Domain Protection has made a prima facie showing of its proprietary interest in the Domain Names for these reasons.

### b. Sea Wasp's Lack of Authority

The question, then, is whether Sea Wasp is authorized to lock the Domain Names while underlying disputes over their ownership are litigated. *See Bailey v State*, 885 S.W.2d 193, 1999 (Tex. App.—Dallas 1994, *pet. ref'd*) (explaining that "intangible property such as a bank balance can be appropriated by the exercise of control over that property"). Section 3.8 of the Accreditation Agreement requires all registrars to incorporate ICANN's Uniform Domain Name Dispute Resolution Policy ("UDRP") into their registration agreements with domain-name registrants (Dkt. #54, Exhibit 8 at p. 12). This means that the UDRP governs both the registrar's and the registrant's rights "in connection with a dispute between [domain-name registrants] and any party other than . . . the registrar . . . over the resolution and use of an Internet domain name registered by [the registrant]." (Dkt. #54, Exhibit 2 at p. 1).

Sea Wasp notes that, under the UDRP, registrars are required to "[m]aintain the [s]tatus [q]uo" once a dispute arises (Dkt. #54, Exhibit 2 at p. 5). According to Sea Wasp, this means that it can and must place a lock on the Domain Names to ensure that the Domain Names are fully intact once the ownership dispute is resolved. But Sea Wasp's interpretation is not supported by the UDRP's terms. The UDRP makes clear that, while a dispute is ongoing, it "**will** cancel, transfer or otherwise make changes to domain name registrations" on "receipt of written or appropriate electronic **instructions from you or your authorized agent**" or on receipt of a court order or an administrative decision (Dkt. #54, Exhibit 2 at pp. 2) (emphasis in original). The UDRP adds that,

to "[m]aintain the [s]tatus [q]uo," it "will not cancel, transfer, activate, deactivate, or otherwise change the status of any domain name registration under this Policy" for any other reason. (Dkt. #54, Exhibit 2 at p. 5). These provisions plainly preserve the "status quo" by presuming that the party in possession of a domain name can exercise control over them while a dispute is ongoing. In fact, the UDRP appears to limit the registered name holder's right to access and control over the domain names it holds in one way: the registered name holder must ensure that whomever it transfers the domain names to will agree, in writing, to comply with any order resolving an ongoing dispute over the domain names (Dkt. #54, Exhibit 2 at p. 5). Domain Protection is the registered name holder in this case and has asked Sea Wasp, by email, to unlock the Domain Names so that it may transfer the Domain Names, make other changes to their registration information, or both. The UDRP requires Sea Wasp to comply with Domain Protection's wishes—assuming, of course, that any domain name recipient agrees to comply with the Court order resolving this dispute.

Sea Wasps is not convinced. It argues that Domain Protection cannot file this suit since the UDRP states that the registrar "will not participate in any way in any dispute between you and any party other than us regarding the registration and use of [the registrant's] domain name. [The registrant] shall not name [the registrar] as a party or otherwise include [it] in any such proceeding." (Dkt. #54, Exhibit 2 at p. 5). The Court disagrees. Domain Protection is suing Sea Wasp for its failure to comply with the UDRP. Domain Protection is not joining Sea Wasp in a suit against Baron or others who claim ownership over the Domain Names.

Sea Wasp notes that, under ICANN's Inter-Registrar Transfer Policy, the "Registrar of Record may deny a transfer request" when there is a "[r]easonable dispute over the identity of the Registered Name Holder or Administrative Contact." (Dkt. #54, Exhibit 22 at p. 4) (emphasis in original). According to Sea Wasp, this Policy allows it to place an executive lock on the Domain

Names—presumably because such a lock prevents Domain Protection from transferring the Domain Names to another registrar.[6] But a dispute over whether Domain Protection is the *rightful owner* of the Domain Names does not constitute a dispute over "the <u>identity</u> of the Registered Name Holder" (Dkt. #54, Exhibit 22 at p. 4) (emphasis in original). This is evident from ICANN's instruction that, in such a dispute, the registrar "may request ID documents." *See* ICANN, ABOUT ID REQUIREMENTS, https://www.icann.org/resources/pages/id-2013-05-03-en (last visited July 8, 2019). This is not a dispute over "the <u>identity</u>" of the Registered Name holder as a result.

Sea Wasp's interpretation of the Inter-Registrar Transfer Policy is too broad, regardless. This policy allows the Registrar to prevent Domain Protection from transferring the Domain Names to another Registrar when applicable. It does not allow the Registrar to place an executive lock on the Domain Names, which prevents the registrant from making *any changes* to the registration information associated with the Domain Names. After all, there are other, less restrictive ways to prevent domain names from being transferred from one registrar to another than an executive lock—such as by denying an inter-registrar transfer or imposing a "registrar lock" (Dkt. #60 at p. 16). As *Sea Wasp* explains, a registrar lock "merely prevents domain names from being transferred to another registrar" without an executive lock's other restrictions (Dkt. #60 at p. 16). In short, if ICANN intended to require registrars to place an executive lock on a domain name while an ownership dispute was ongoing, it would have said so. *See, e.g., GoForIt Entm't, LLC v. DigiMedia.com L.P.*, 750 F. Supp. 2d 712, 738 n.20 (N.D. Tex. 2010) (discussing a provision allowing a registrar to, "at its sole discretion, suspend [the customer's] ability to use [its] domain name or to make modifications to [its] registration records" once the registrar "is notified that a complaint has been filed with a judicial or administrative body regarding [customer's]

---

[6] Sea Wasp does not explain why a policy on "inter-registrar transfer" allows it to place an executive lock on the Domain Names.

domain name"). ICANN does just that in other contexts. ICANN provides that a lock should be placed on a domain name in the course of certain disputes—such as when a claim is filed with ICANN's Uniform Rapid Suspension System (the URS").[7] *See, e.g.,* ICANN, URS PROCEDURE at p. 7, *available at* https://newgtlds.icann.org/en/applicants/urs (last visited July 11, 2019) (explaining that, once a URS complaint is filed, the registrar is to lock the domain names). ICANN clearly "knew how to state clearly" when a lock should be imposed and chose not to require one every time a dispute over a domain name arises. *See El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 811 (Tex. 2012) ("[T]hose other contract provisions support our reading of the contract because they show that the parties knew how to state clearly when some risks were not to be assumed by MasTec.").

Because Sea Wasp does not challenge Domain Protection's likelihood of success on any other grounds, thereby waiving these arguments, Domain Protection has established that there is a substantial likelihood that it will succeed on its claims.[8] *See Audler v. CBC Innovis Inc.*, 519 F.3d 239, 255 (5th Cir. 2008) (quoting *Castro v. McCord*, 259 F. App'x 664, 665 (5th Cir. 2007)) ("A party 'waives an issue if he fails to adequately brief it.'").

### III.    Substantial Threat of Irreparable Harm

The Court must therefore determine whether Domain Protection will likely suffer a substantial threat of irreparable harm if the motion is not granted. The "central inquiry in deciding whether there is a substantial threat of irreparable harm is whether the plaintiff's injury could be compensated by money damages." *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810

---

[7] The URS is "a lower-cost, faster path to relief [ICANN makes available] for . . . clear-cut cases of infringement caused by domain name registrations," ICANN, ABOUT UNIFORM RAPID SUSPENSION SYSTEM (URS), https://www.icann.org/resources/pages/urs-2013-10-31-en (last visited July 11, 2019).

[8] The Court appreciates that Sea Wasp raises other arguments challenging the merits of Domain Protection's claims in other briefs, such as its Response to Domain Protection's Motion for Summary Judgment. The Court will address those arguments in those motions since they are properly raised there.

n.1 (5th Cir. 1989) (citing *City of Meridian v. Algeron Blair, Inc.*, 721 F.2d 525, 529 (5th Cir. 1983)). Although economic harms are usually recoverable, this is not the case "when the nature of those rights makes 'establishment of the dollar value of the loss . . . especially difficult or speculative.'" *Id.* at 810 n.1 (5th Cir. 1989) (quoting *Miss. Power & Light*, 760 F.2d 618, 630 n.12 (5th Cir. 1985)). These economic harms can therefore amount to irreparable injury. *See id.*

The record reflects that, while an executive lock is on the Domain Names, Domain Protection is not permitted to change its registration records, transfer the Domain Names, or otherwise monetize the names. This is likely to cause irreparable injury to Domain Protection for (at least) three reasons.[9]

First, Domain Protection notes that the lock prevents them updating the registration information affiliated with the Domain Names to reflect that it is no longer working with Bidtellect. This means that, even though Domain Protection has contracted with a new advertisement management company, its Domain Names and the emails affiliated with the Domain Names are being directed to Bidtellect's sites. Accordingly, unless the lock is removed, Domain Protection's access to its traffic data and emails turn entirely on Bidtellect—a party with whom it terminated a contractual relationship after a dispute over non-negotiable terms. This means that, until the lock is removed, Domain Protection lacks access to any emails it has received, including business opportunities that may be time-sensitive.[10]

Second, Domain Protection's inability to transfer the Domain Names causes economic harms that are essentially impossible to calculate. This is due to the unique market for domain names. Although there are countless domain names a customer can register or purchase, each

---

[9] Domain Protection raises other arguments as to why it will suffer irreparable injury. While these arguments may be valid, the Court does not need to address them.
[10] The Court assumes that this assertion is correct since Sea Wasp has not challenged it.

individual domain name is marketable to a small subset of potential clients—those whom believe that the name reflects their brand or the products and services they provide. Accordingly, when a would-be customer purchases a domain name from a Domain Protection competitor, that customer is likely lost forever and might not be easily replaced. This makes it very difficult, if not impossible, to determine how many domain names Domain Protection could not sell while the lock was in place. *See Allied Mktg.*, 878 F.2d at 810 (quoting *State of Tex. v. Seatrain Int'l, S.A.,* 518 F.2d 175, 179 (5th Cir.1975)) (explaining that "a finding of irreparable harm is appropriate even where economic rights are involved when the nature of those rights makes 'establishment of the dollar value of the loss . . . especially difficult or speculative.'").

Third, Domain Protection presently has $2000 in its account. And, although Domain Protection has other funds that Sea Wasp holds and has agreed to use to renew some domain names, these funds are insufficient to cover the renewal cost for all of them. This means that, unless the lock is lifted, Domain Protection will lose the rights to unique domain names on expiration.

Sea Wasp does not challenge these assertions. It, instead, questions whether Domain Protection will face imminent, irreparable harm since Domain Protection could have sought a motion for preliminary injunction the first time the Domain Names were locked but did not do so. The Court is unpersuaded. Domain Protection's claims of irreparable harm are based on facts that are true now, which were not necessarily true while the first set of disputes were ongoing. Domain Protection states, for instance, that it *now* has $2,000 in its account and lacks the funds to renew all the domain names.

Sea Wasp also questions why Domain Protection did not and has not asked ICANN to resolve this dispute without filing suit. But the Court fails to see how the forum in which Domain Protection seeks relief is relevant to its position that it will suffer irreparable harm without a

preliminary injunction. After all, Domain Protection seeks monetary damages that ICANN might not be able to award. The complex nature of this case and the need for a quick resolution of these claims may also make federal court a better forum to hear this dispute. This is especially true here in light of this District's "history of timely and efficient resolution of cases." *Tridle v. Union Pacific R. Co.*, No. 9:07CV213, 2008 WL 4722854, at *1 (E.D. Tex. Oct. 15, 2008).

In sum, Domain Protection has established that it will likely suffer irreparable harm.

## IV. Balance of Threatened Hardships

The Court will thus proceed to the next question: whether the irreparable harms Domain Protection faces without an injunction are outweighed by those imposed on Sea Wasp if one is entered. Sea Wasp believes they are, citing the liability it may face if it unlocks the Domain Names without a Court Order.[11] The Court is perplexed by this position. By granting the Motion for Preliminary Injunction, the Court is providing Sea Wasp with the Order it requests. Sea Wasp's concerns about its liability appears overblown, regardless. Sea Wasp has not cited, nor has the Court located, a single case in this Circuit in which a registrar is found liable for following its obligations under ICANN. To the contrary, the few courts encountering this issue recognize that a registrar may refuse "to disable [a] domain name and website" during a dispute between the registrant and third parties without facing legal liability. *See, e.g., Petroliam Nasional*, 897 F. Supp. 2d at 861–72 (granting summary judgment for registrar on all claims asserted against it by a third party in a dispute with a registrant over whether the domain name infringed on its trademarks).

---

[11] Sea Wasp's efforts to avoid being involved in litigation appears to have failed anyway—as evidenced by the countless motions both parties have filed in this case. The Court reminds the Parties of their obligation "to secure the judge, speedy, and inexpensive determination of every action and proceeding." FED. R. CIV. P. 1 (explaining that this obligation is imposed on "the court *and the parties*") (emphasis added).

Since Sea Wasp has not raised any other reason why it will suffer harm if an injunction is issued, the Court cannot find that the balance of threatened harms weighs in Sea Wasp's favor.

## V.     Disservice to the Public

This motion thus turns on one question: whether removing the executive lock would disservice the public. Sea Wasp notes that, if the lock is removed, Domain Protection may sell the Domain Names and prevent Baron from claiming them if he prevails in the Underlying Dispute. But there are avenues Baron may pursue to protect this interest that do not involve Sea Wasp's interference—such as a motion for preliminary injunction in the court where the ownership dispute is being heard.[12] *See, e.g., Chanel, Inc. v. P'ships. & Unincorporated Ass'n Identified in Schedule A*, No. H-12-2085, 2012 WL 3756287, at *3 (S.D. Tex. 2012) (granting a preliminary injunction in a trademark infringement dispute between the owner of the trademark and the owner of domain names alleged to have infringed the trademark that involved locking the domain names during the pendency of the suit). Additionally, Domain Protection is permitted to transfer the Domain Names only to parties that contractually agree to abide by any court orders concerning the ownership of the domains. If there are parties that are willing to subject themselves to the risk that a court could find their ownership null and void, the UDRP prevents Sea Wasp from interfering with those transactions.

Sea Wasp contends that, because ICANN has internal procedures that allow Domain Protection to challenge the lock, it would be in the public interest for the Court to defer to those procedures. But Sea Wasp does not cite a single provision that *requires* Domain Protection to use those procedures—or even that ICANN believes that its internal procedures are preferable to court-litigated disputes. In fact, ICANN requires only certain trademark disputes to be litigated through

---

[12] The Court has no opinion on whether a court facing that question should grant or deny a motion for temporary restraining order or preliminary injunction.

ICANN's mandatory administrative proceedings (*see* Dkt. #54, Exhibit 2 at p. 1). The Court thus cannot conclude that Domain Protection's decision to file a lawsuit in a federal court, rather than another forum of its choosing, somehow implicates public policy.

## VI.    No Security Necessary

The only remaining issue, then, is the amount Domain Protection should provide as security to support its requested injunction. Under Rule 65, the party seeking a preliminary injunction must "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). The Fifth Circuit has held that the security amount imposed is a discretionary call and that the "proper" amount of security may be zero. *See Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300, 302-03 (5th Cir. 1978) (citing *Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1356 (2d Cir. 1974), *cert. denied*, 417 U.S. 932 (1974)) ("The amount of security required is a matter for the discretion of the trial court; it may elect to require no security at all."). Domain Protection argues, and Sea Wasp does not dispute, that zero is the appropriate amount here. The Court agrees. Aside from concern about the potential liability that may result if it unlocks the Domain Name without a Court Order, which will be moot once this Order is entered, Sea Wasp has not provided evidence that it will suffer any harm once the lock is removed. *See Int'l Controls*, 490 F.2d at 1356 ("[T]he district court may dispense with security where there has been no proof of likelihood of harm to the party enjoined."). Waiving the security requirement is especially appropriate here in light of Domain Protection's limited finances. Again, Domain Protection has just $2000 in its account. The Court will not order Domain Protection to forfeit these limited funds as security.

**CONCLUSION**

For these reasons, Defendant Sea Wasp, LLC's Motions to File Sur-Reply (Dkt. #79; Dkt. #83) and to file Supplement (Dkt. #120) are **GRANTED**;

Plaintiff Domain Protection, LLC's Motion to Strike Sur-Reply (Dkt. #81) is **DENIED**; and

Domain Protection's Motion for Preliminary Injunction (Dkt. #54) is **GRANTED** as described herein.

Accordingly, Sea Wasp is **ENJOINED** from interfering with Domain Protection's control over the Domain Names, including its ability to update the nameserver records associated with the Domain Names;[13]

Sea Wasp is **DIRECTED** to immediately undo all changes it made without Domain Protection, LLC's permission to the Domain Names' nameserver records; and

The Court **WAIVES** the requirement for Domain Protection to provide security in support of the injunction granted in this Order, which will remain in effect until all claims are resolved.

**IT IS SO ORDERED.**

**SIGNED this 17th day of July, 2019.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

---

[13] Sea Wasp may, of course, exercise any control over the Domain Names that is proper under the UDRP and not inconsistent with this Order—such as by requiring any party who is assigned the Domain Names to comply with any applicable court order concerning their ownership and disposition (*see* Dkt. #54, Exhibit 2 at p. 5).