# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| DOMAIN PROTECTION, LLC, | § | |
| *Plaintiff,* | § | |
| v. | § | Civil Action No. 4:18-cv-792 |
| | § | Judge Mazzant |
| SEA WASP, LLC, ET. AL. | § | |
| *Defendants.* | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court are: (1) Motion to Dismiss for Lack of Personal Jurisdiction by Individual Defendants Vernon Decossas and Gregory Faia ("Individual Defendants") (Dkt. #173); (2) Sea Wasp, LLC's ("Sea Wasp") Rule 17 Motion to Dismiss Regarding Real Party in Interest (Dkt. #180); (3) Defendants' Motion to Dismiss for Lack of Standing (Dkt. #228) ("Defendants" refers to Sea Wasp, Vernon Decossas, and Gregory Faia collectively); (4) Defendants' Motion to Extend Page Limit for Reply in Support of Motion to Dismiss for Lack of Standing (Dkt. #247); and (5) Defendants' Motion to Schedule Hearing on Defendants' Motion to Dismiss for Lack of Standing (Dkt. #253). Having considered the Motions and the relevant pleadings, the Court finds that each Motion is **DENIED** save Defendants' Motion to Extend Page Limit for Reply in Support of Motion to Dismiss for Lack of Standing (Dkt. #247) which is **GRANTED**.

## BACKGROUND

Domain Protection is the registered name holder for over 50,000 domain names (the "Domain Names"). Sea Wasp is the registrar over those names. This suit concerns whether Sea Wasp is encroaching on Domain Protection's proprietary interest in the Domain Names by turning the executive lock on them, which prevents Domain Protection from selling the Domain Names or

updating their registration information. Sea Wasp insists that Domain Protection lacks any proprietary interest in the Domain Names in light of a dispute over their ownership.

A summary on how Domain Protection came into possession of the Domain Names may be helpful at this point. In 2014, three parties filed suit in the Northern District of Texas against Jeffrey Baron and one of his companies for misappropriating their domain names. The court found Baron to be a vexatious litigator and, on this basis, appointed a receiver (the "Receiver") over his assets while the dispute was pending (Dkt. #54, Exhibit 15). The court also placed assets belonging to Novo Point, LLC ("Novo Point") and Quantec, LLC ("Quantec") (collectively, the "LLCs'"), two limited liability companies with ties to Baron (Dkt. #54, Exhibit 13), in the Receiver's custody. The LLCs' assets included the Domain Names.

On appeal, Baron argued that the court lacked jurisdiction to enter the receivership order, and the Fifth Circuit agreed. This prompted the district court to unwind the receivership (the "Unwind Order") (Dkt. #54, Exhibit 17). Assets held in Baron's name would be returned to him. But it was not immediately apparent whom to return the LLCs' assets to in light of a dispute over who could properly act for them. Without resolving the dispute, the court directed the Receiver to return the Domain Names to Lisa Katz, the Local Operations Manager for the LLCs. Katz was entrusted to manage the LLCs' assets, including the Domain Names, until the dispute over control of the LLCs was resolved (Dkt. #54, Exhibit 14 at pp. 4–5 n.2; Dkt. #54, Exhibit 17).

Baron-affiliates Mike Robertson and David McNair (the "Baron Affiliates") tried to induce the registrar over the Domain Names, fabulous.com ("Fabulous"), into giving them control of the Domain Names anyway. But the Receiver intervened, instructing Fabulous to handover the Domain Names to Katz, pursuant to the Unwind Order (Dkt. #54, Exhibit 17). Katz then assumed control over the Domain Names. Katz explains that the LLCs had racked up substantial debt while

they were under receivership, prompting "creditors [to] threaten[] to place the LLCs in bankruptcy for liquidation." (Dkt. #54, Exhibit 31 at p. 2). To prevent this, Katz assigned the Domain Names to Domain Protection, a company where she is also manager. The plan was for Domain Protection to liquidate the Domain Names as needed to pay off the LLCs' debts (Dkt. #54, Exhibit 31 at p. 2). But Baron had contemporaneously filed suits in Texas and Australia challenging Katz's possession of the LLCs' assets. This prompted Fabulous to place an "executive lock" on the Domain Names while these actions were pending, which prevented Domain Protection from liquidating the Domain Names during the duration of the suits.

Neither suit was successful (Dkt. #54, Exhibit 9; Dkt. #54, Exhibit 12). In August 2017, after the suits had been dismissed, Domain Protection asked Fabulous to restore its access to the Domain Names. Sea Wasp purchased Fabulous roughly at the same time. While the Parties dispute what immediately followed, they agree that, "[a]t least between January 28, 2018 to February 11, 2018, there was not an 'Executive Lock' on the [D]omain [N]ames." (Dkt. #42 at p. 1). Domain Protection began managing the affairs over the Domain Names shortly after. It started by replacing Bidtellect as the advertisement revenue manager (the "Advertising Manager") for the Domain Names on receipt of a "concerning" letter from Bidtellect (Dkt. #54 at p. 10). Bidtellect was apparently exasperated with the series of disputes over the Domain Names and proposed certain non-negotiable terms to continue their contractual relationship. Domain Protection responded by terminating its contract with Bidtellect, contracting with a new Advertising Manager, and updating the registration information for the Domain Names accordingly. This involved updating the Domain Names' "nameserver records," which ensured that, when a user typed a Domain Protection domain name in a web browser, the user would be directed to a placeholder website hosted by the new Advertising Manager.

By late February 2018, two or three weeks after the lock was removed, Baron filed another suit (the "Underlying Dispute") challenging Katz's authority to transfer the Domain Names. *See In re Payne*, No. 16-04110 (Bankr. E.D. Tex. 2018). Domain Protection believes that Baron filed this suit simply to lock the Domain Names indefinitely, citing correspondence to that effect from Baron's attorneys (*see* Dkt. #54, Exhibit 28). Sure enough, Sea Wasp responded by reverting the changes Domain Protection had made to the Domain Names' nameserver records and turning the executive lock back on. Domain Protection notes that Robertson, one of the Baron Affiliates who tried to take control of the Domain Names in violation of the Unwind Order, is now a principal or "key person" at Sea Wasp (Dkt. #54, Exhibit 31 at pp. 3–4).

On June 18, 2018, Domain Protection brought this present action against Sea Wasp for interference with contract, civil conspiracy, conversion, and respective violations of the Texas Theft Liability Act and the Stored Communications Act. Domain Protection alleges that, by turning the executive lock back on, Sea Wasp is encroaching on its proprietary interests in the Domain Names since it cannot transfer them or update their nameserver records. Sea Wasp, however, insists that it can and must place a lock on the Domain Names while a dispute is pending, citing its obligations as a registrar accredited with the Internet Corporation for Assigned Names and Numbers ("ICANN"). On July 17, 2019, the Court entered a Preliminary Injunction which enjoined Sea Wasp from "interfering with Domain Protection's control over the Domain Names, including its ability to update the nameserver records associated with the Domain Names" (Dkt. #192). Despite the Court's Order, matters have only further deteriorated between the parties.

Since the filing of this action—only a little over one year ago—over 250 docket entries have occurred. One of those docket entries was Domain Protection's Amended Complaint (Dkt. #93). In its Amended Complaint, Domain Protection added Gregory Faia ("Faia") and

Vernon Decossas ("Decossas") as Individual Defendants. It does well to provide a brief discussion

of who the Individual Defendants are at this point. Faia and Decossas "are the owners and officers

and directors of Sea Wasp" (Dkt. #173). Faia is domiciled in Lousiana (Dkt. #93; Dkt. #173) and

Decossas is domiciled in Florida (Dkt. #93; Dkt. #173). Sea Wasp, on the other hand, was "created

in 2017 as a Nevada limited liability company, [and] is a citizen of Louisiana whose members

reside in Louisiana" (Dkt. #93). According to Domain Protection, "Faia and Decossas directly

own, control and use Sea Wasp to accomplish the actions complained of in this Complaint

(Dkt. #181) (citing Dkt. #93). Thus, Domain Protection claims that Sea Wasp is nothing more

than a shell entity which the Individual Defendants use to evade existing legal obligations, rely

upon as protection of a crime, and rely upon to justify any wrongs or torts (Dkt. #93). For these

reasons, Domain Protection amended its complaint to add the Individual Defendants to the present

action.

   The vast amount of docket activity previously referenced has not occurred without discord.

The parties have vehemently disputed each claim, motion, and order and have continually engaged

in ad hominem attacks unbecoming of officers of the Court.[1] Among these contentious disputes,

the parties have now turned to debating the capacity of this suit to be brought in the Court. On

June 25, 2019, Vernon Decossas and Gregory Faia filed a Motion to Dismiss for Lack of Personal

Jurisdiction by Individual Defendants Vernon Decossas and Gregory Faia (Dkt. #173).[2] On July

---

[1] *See* LOCAL RULE AT-3(k) ("Effective advocacy does not require antagonistic or obnoxious behavior, and members of the bar will adhere to the higher standard of conduct which judges, lawyers, clients, and the public may rightfully expect.").

[2] The Individual Defendants claim that:

   Neither Individual Defendant has ever resided in the State of Texas. Neither Individual Defendant owns any real or personal property in Texas nor does any Individual Defendant hold any mortgage, lien, security interest, or other encumbrance in Texas. Neither Individual Defendant leases any real property in Texas. Neither Individual Defendant owns a bank account in Texas nor does any Individual Defendant transact any business with any financial institution in Texas. The Individual Defendants do not pay any taxes in Texas, and neither Individual Defendant is required to pay taxes in Texas. Neither Individual Defendant has contracted with any employees, agents, vendors, customers, or representatives for any goods or services

5, 2019, Sea Wasp followed this Motion up with Sea Wasp, LLC's Rule 17 Motion to Dismiss Regarding Real Party in Interest (Dkt. #180).[3]  On August 19, 2019, Vernon Decossas, Gregory Faia, and Sea Wasp filed Defendants' Motion to Dismiss for Lack of Standing (Dkt. #228).  This Motion includes a Motion to Dismiss under Rule 12(h)(3) and Rule 12(b)(6) (Dkt. #228). Defendants' Motion to Dismiss for Lack of Standing was followed by Defendants' Motion to Extend Page Limit for Reply in Support of Motion to Dismiss for Lack of Standing (Dkt. #247) and Defendants' Motion to Schedule Hearing on Defendants' Motion to Dismiss for Lack of Standing (Dkt. #253).  Domain Protection opposes each Motion and claims that: (1) "Defendants Faia and Decossas were amenable to service of process and are subject to the personal jurisdiction of this Honorable Court through both the federal and state law claims in this case" (Dkt. #181); (2) Domain Protection is the holder of the substantive rights at issue in this action (Dkt. #195); (3) Domain Protection has a legally protected interest in the Domain Names and thus has established Article III standing (Dkt. #244); and (4) a hearing on the issue of standing is unnecessary (Dkt. #255).  The Court addresses Sea Wasp's, Defendants, and the Individual Defendants' Motions below.

---

in Texas nor has either Individual Defendant solicited the services of any entity for goods or services in Texas.  With the exception of this action, neither Individual Defendant is a party to any litigation in Texas. Finally, neither Individual Defendant has purposefully availed himself of the privilege of conducting business in Texas, nor of seeking the benefit and protection of the laws of the State of Texas with the exception of the current litigation.
Dkt. #173.
[3] Notably, the Court entered its Scheduling Order on December 20, 2018 (Dkt. #65).  In the Order, the Court stated that motions to dismiss, motions for summary judgment, or other dispositive motions were due by April 10, 2019. On April 10, 2019, the Court entered an Order granting Sea Wasp's Motion for Extension of Time (Dkt. #115). This Order extended the time to file dispositive motions and for Defendants to file amended pleadings to May 1, 2019.

**LEGAL STANDARD**

**a. Standing**

      **i.    Rule 12(b)(1)**

"Different standards apply when a litigant challenges standing on a FED. R. CIV. P. 12(b) motion than on a motion for summary judgment under FED. R. CIV. P. 56." *Cramer v. Skinner*, 931 F.2d 1020, 1024 (5th Cir. 1991). Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a case for lack of subject matter jurisdiction when the district court lacks the "statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998); *accord* FED. R. CIV. PRO 12(b)(1). If a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the Court will consider the jurisdictional attack under Rule 12(b)(1) before addressing any attack on the legal merits. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

In deciding the motion, the Court may consider "(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the [C]ourt's resolution of disputed facts." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) (quoting *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)). The Court will accept as true all well-pleaded allegations set forth in the complaint and construe those allegations in the light most favorable to the plaintiff. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'") (citing *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889 (1990)); *Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994). Once a defendant files a motion to dismiss under Rule 12(b)(1) and

7

challenges jurisdiction, the party invoking jurisdiction has the burden to establish subject matter jurisdiction. *See Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980). The Court will grant a motion to dismiss for lack of subject matter jurisdiction only if it appears certain that the claimant cannot prove a plausible set of facts to support a claim that would entitle it to relief. *Lane*, 529 F.3d at 557.

When the defendant moves for summary judgment because of a lack of standing, however, the plaintiff must submit affidavits and comparable evidence that indicate that a genuine issue of fact exists on the standing issue. *See Lujan*, 504 U.S. at 561 ("In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," FED. R CIV. PRO. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial." (citing *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 114–15 (1979)).

### ii.     Rule 12(b)(6)

The Federal Rules of Civil Procedure require that each claim in a complaint include a "short and plain statement . . . showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Each claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012). The Court may consider "the

complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The Court must then determine whether the complaint states a claim for relief that is plausible on its face. "'A claim has facial plausibility when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "But where the well-pleaded facts do not permit the [C]ourt to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the Court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 664. Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'" *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009) (citation omitted). This evaluation will "be a context-specific task that requires the reviewing [C]ourt to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

### b. Rule 17(a) – Real Party in Interest

Federal Rule of Civil Procedure 17(a) provides that "all actions be prosecuted in the name of the 'real party in interest.' The real party in interest is the person holding the substantive right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery." *U.S. ex rel. Spicer v. Westbrook*, 751 D.3d 354, 362 (5th Cir. 2014) (citing *Wieburg v. GTE Sw. Inc.*, 272 F.3d 302, 306 (5th Cir. 2014); *Farrell Constr. Co. v. Jefferson Parish,* 896 F.2d 136, 140 (5th Cir. 1990)). To determine who the real party in interest is under Rule 17(a), a court must determine whether the party is granted the right to sue under the applicable substantive law. *See Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250, 256 (5th Cir. 1980).

Rule 17(a) limits a Court's discretion to "dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Fed. R. Civ. P. 17(a)(3); *see also BCC Merchant Solutions, Inc. v. Jet Pay, LLC*, 129 F. Supp. 3d. 440, 459 (N.D. Tex. 2015). Any defense claiming that a party is not the real party in interest "is waived when it is not timely asserted." *Rogers v. Samedan Oil Corp.*, 308 F.3d 477, 483 (2002) (citing *Gogolin & Stelter v. Karn's Auto Imports, Inc.*, 886 F.2d 100 (5th Cir. 1989). "The objection must be raised when joinder is practical and convenient. The earlier the defense is raised, the more likely that the high cost of trial preparation for both parties can be avoided if a real party in interest question is determined adversely to a plaintiff." *Id.* (internal citations omitted). "There is no magic formula for determining practicality and convenience." *In re* Signal Intern., LLC, 579 F.2d 478, 488 (5th Cir. 2009) (citing 6A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1554 (2d ed. 1990) (noting that Rule 17 does not "indicate when the challenge should be made" and documenting that an objection should be made with "reasonable

promptness")). Indeed, "[t]he decision turns on the facts of each case and is within the discretion of the district court." *Id.; see also* WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1554 ("[T]he courts should be given the flexibility to treat the waiver question as one addressed to their discretion so that the issue can be determined in terms of what seems appropriate in a particular case."). The Fifth Circuit has instructed that there are multiple factors a court should consider when determining whether a Rule 17(a) defense has been waived. *Id.* Those factors include:

> [W]hen the defendant knew or should have known about the facts giving rise to the plaintiff's disputed status as a real party in interest; whether the objection was raised in time to allow the plaintiff a meaningful opportunity to prove its status; whether it was raised in time to allow the real party in interest a reasonable opportunity to join the action if the objection proved successful; and other case-specific considerations of judicial efficiency or fairness to the parties.

*Id.*

### c. Rule 12(b)(2) – Personal Jurisdiction

Federal Rule of Civil Procedure 12(b)(2) requires a court to dismiss a claim if the court does not have personal jurisdiction over the defendant. FED. R. CIV. P. 12(b)(2). After a non-resident defendant files a motion to dismiss for lack of personal jurisdiction, it is the plaintiff's burden to establish that *in personam* jurisdiction exists. *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990) (citing *WNS, Inc. v. Farrow*, 884 F.2d 200, 202 (5th Cir. 1989)).

To satisfy that burden, the party seeking to invoke the court's jurisdiction must "present sufficient facts as to make out only a *prima facie* case supporting jurisdiction," if a court rules on a motion without an evidentiary hearing. *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000). When considering the motion to dismiss, "[a]llegations in [a] plaintiff's complaint are taken as true except to the extent that they are contradicted by defendant's affidavits." *Int'l Truck & Engine Corp. v. Quintana*, 259 F. Supp. 2d 553, 557 (N.D. Tex. 2003) (citing *Wyatt v. Kaplan*, 686 F.2d 276, 282–83 n.13 (5th Cir. 1982)); *accord Black v. Acme Mkts., Inc.*, 564 F.2d

681, 683 n.3 (5th Cir. 1977). Further, "[a]ny genuine, material conflicts between the facts established by the parties' affidavits and other evidence are resolved in favor of plaintiff for the purposes of determining whether a *prima facie* case exists." *Id.* (citing *Jones v. Petty-Ray Geophysical Geosource, Inc.*, 954 F.2d 161, 1067 (5th Cir. 1992)). However, if a court holds an evidentiary hearing, a plaintiff "must establish jurisdiction by a preponderance of the admissible evidence." *In re Chinese Manufactured Drywall Prods. Liab. Lit.*, 742 F.3d 576, 585 (5th Cir. 2014) (citing *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241–42 (5th Cir. 2008)).

A court conducts a two-step inquiry when a defendant challenges personal jurisdiction. *Ham v. La Cinega Music Co.*, 4 F.3d 413, 415 (5th Cir. 1993). First, absent a controlling federal statute regarding service of process, the court must determine whether the forum state's long-arm statute confers personal jurisdiction over the defendant. *Id.* And second, the court establishes whether the exercise of jurisdiction is consistent with due process under the United States Constitution.

The Texas long-arm statute confers jurisdiction to the limits of due process under the Constitution. *Command-Aire Corp. v. Ont. Mech. Sales and Serv. Inc.*, 963 F.2d 90, 93 (5th Cir. 1992). Therefore, the sole inquiry that remains is whether personal jurisdiction offends or comports with federal constitutional guarantees. *Bullion*, 895 F.2d at 216. The Due Process Clause permits the exercise of personal jurisdiction over a non-resident defendant when the defendant has established minimum contacts with the forum state "such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Minimum contacts with a forum state can be satisfied by

contacts that give rise to either general jurisdiction or specific jurisdiction. *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994).

General jurisdiction exists only when the defendant's contacts with the forum state are so "'continuous and systematic' as to render them essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)); *see Cent. Freight Lines v. APA Transp. Corp.*, 322 F.3d 376, 381 (5th Cir. 2003) (citing *Helicopteros Nacionales de Colum., S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)). Substantial, continuous and systematic contact with a forum is a difficult standard to meet and requires extensive contacts between a defendant and the forum. *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008). "General jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed." *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 717 (5th Cir. 1992) (citation omitted). However, "vague and overgeneralized assertions that give no indication as to the extent, duration, or frequency of contacts are insufficient to support general jurisdiction." *Johnston*, 523 F.3d at 609 (citing *Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 596 (5th Cir. 1999)).

Specific jurisdiction is proper when the plaintiff alleges a cause of action that grows out of or relates to a contact between the defendant and the forum state. *Helicopteros*, 466 U.S. at 414 n.8. For the court to exercise specific jurisdiction, the court must determine "(1) whether the defendant has . . . purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal

jurisdiction is fair and reasonable." *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)).

Defendants who "'reach out beyond one state' and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for consequences of their actions." *Burger King Corp*., 471 U.S. at 475 (citing *Travelers Health Assoc. v. Virginia*, 339 U.S. 643, 647 (1950)). Establishing a defendant's minimum contacts with the forum state requires contacts that are more than "random, fortuitous, or attenuated, or of the unilateral activity of another party or third person." *Id*.

"If the plaintiff successfully satisfies the first two prongs, the burden shifts to the defendant to defeat jurisdiction by showing that its exercise would be unfair or unreasonable." *Seiferth v. Helicopteros Atuneros*, *Inc.*, 472 F.3d 266, 271 (5th Cir. 2006). In this inquiry, the Court examines five factors: (1) the burden on the nonresident defendant; (2) the forum state's interests; (3) the plaintiff's interest in securing relief; (4) the interest of the interstate judicial system in the efficient administration of justice; and (5) the shared interest of the several states in furthering fundamental social policies. *Burger King*, 471 U.S. at 477. "It is rare to say the assertion of jurisdiction is unfair after minimum contacts have been shown." *McFadin v. Gerber*, 587 F.3d 753, 760 (5th Cir. 2009) (quoting *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999)).

## ANALYSIS

I.     Motion to Dismiss under 12(b)(6)

Defendants filed a Motion to dismiss under Rule 12(b)(6) for failure to state a claim. The Court, accepting as true all well-pleaded facts, *Bowlby*, 681 F.3d at 219, finds that Domain Protection has stated a claim for relief that is plausible on its face. *Iqbal*, 556 U.S. at 678. Accordingly, Defendants' Motion to Dismiss under Rule 12(b)(6) is denied.

II.     Motion to Dismiss for Lack of Standing[4]

Article III of the Constitution limits federal jurisdiction to "Cases" and "Controversies." *See* U.S. CONST. Art III; *Aetna Life Ins. Co. of Hartford Conn. v. Haworth*, 300 U.S. 227, 239 (1937). To have a case or controversy, there must be real parties with an actual dispute. *See Allen v. Wright*, 468 U.S. 737, 750 (1984). Standing addresses whether a plaintiff is the proper party to bring a matter before the court for adjudication. A plaintiff does not have Article III standing if the plaintiff cannot present a case or controversy. Accordingly, a court must decide issues of standing before all other issues because it "determines the court's fundamental power even to hear the suit." *Ford v. NYLCare Health Plan of Gulf Coast, Inc.*, 301 F.3d 329, 332 (5th Cir. 2002). In *Lujan v. Defenders of Wildlife*, the Supreme Court held that Article III standing requires a plaintiff to show the following elements: (1) it has suffered an "injury in fact" that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely the injury will be redressed by a favorable decision. 504 U.S. 555, 560–61 (1992). To have an "injury in fact" or "legally protected interest" the Supreme Court has consistently stressed that a plaintiff's complaint must establish that he has a "personal stake" in the alleged dispute and that the alleged injury suffered is particularized as to him." *Raines v. Byrd*, 521 U.S. 811, 819 (1997); *see also Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1548 (2016) (To establish injury in fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical.") (citations omitted). "[O]bjections to standing are jurisdictional in nature and

---

[4] The Court notes that Sea Wasp has consistently refused to timely raise arguments. For instance, although Sea Wasp should and could have raised its challenge to standing in its response to the motion for preliminary injunction –or at least in its first brief on the motion for reconsideration, it only elected to do so in its reply. Once again, the Court reminds Sea Wasp of its obligation "to secure the just, speedy, and inexpensive determination of every action and proceeding." *See* FED. R. CIV. P. 1 (imposing this duty on the court *and the parties*).

can be raised at any time." *Bankston v. Burch*, 27 F.3d 164, 167 (5th Cir. 1994) (citing FED. R. CIV. P. 12(h)(3)).

To challenge standing, Defendants filed a Motion to Dismiss under Rule 12(h)(3). Rule 12(h)(3) states that "if the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." FED. R. CIV. PRO 12(h)(3). Rule 12(h)(3) is not a vehicle to challenge standing. Rather, Rule 12(b)(1)—the Rule that Rule 12(h)(3) discusses—is the proper vehicle to challenge standing. Rule 12(b)(1) states that "[e]very defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion: (1) lack of subject-matter jurisdiction." FED. R. CIV. PRO 12(b)(1). The Court will thus conduct its standing analysis under Rule 12(b)(1), rather than Rule 56. This means that the Court will accept the allegations in the pleadings as true rather than examining any affidavits or evidence set forth by Domain Protection. *Lujan*, 504 U.S. at 560–61. Defendant's claim, however, that Domain Protection "has the burden to produce evidence that establishes its standing to invoke the Court's federal jurisdiction" (Dkt. #248). Defendant's contention is, to a degree, false (Dkt. #248).[5] While it is true that Domain Protection's pleadings must satisfy the requirements of Article III standing, Domain Protection is not, at this time, required to provide additional proof. Consequently, rather than placing an evidentiary burden on Domain Protection, the Court will take the allegations in the pleadings as true and determine whether Domain Protection has carried its burden by establishing "an invasion of a legally protected interest." *Ford*, 301 F.3d at 332. Domain Protection has carried that burden.

---

[5] Any argument that Defendants make that Domain Protection must provide extrinsic evidence to carry their burden is belied by the posture of Defendants' Motion. Defendants' filed their Motion under Rule 12(h)(3) which expressly implicates Rule 12(b)(1). It is well-settled that "[w]hen a court considers standing on a motion for a Rule 12(b) dismissal, it must accept the allegations in the pleadings as true." *Cramer*, 931 F.2d at 1025. Thus, despite Defendant's citing caselaw that suggests that a court may construe a motion to dismiss as a motion for summary judgment, the Court declines to do so. Defendants may not change the rules of the game simply because it *may* help their case more.

Domain Protection expressly states that "defendants appropriated both control over [its] domain names and Domain Protection's revenue from the domain names" (Dkt. #93). Further, Domain Protection claims that, "[a]s a result of the defendants' actions complained of in this Count, Domain Protection suffered actual damages including lost profit from the sale of domain names, lost income from advertising revenue, and lost income from operating active websites" (Dkt. #93). Domain Protection has pleaded a *general* concrete, particularized, and actual injury. *Lujan*, 504 U.S. at 560. A general injury, however, is insufficient. Standing must be established for each cause of action. *See Spokeo, Inc.*, 136 S.Ct. at 1548. Thus, the Court will address whether Domain Protection has standing for each cause of action.[6]

     i.    Texas Theft Liability Act

"Under the Texas Theft Liability Act ("TTLA"), a person who commits theft is liable for damages resulting from the theft. TEX. CIV. PRAC. & REM. CODE § 134.002(3). 'The TTLA provides victims of a theft, as defined in various sections of the Texas Penal Code, with a civil action to recover damages, fees, and costs from the thief.'" *Beardmore v. Jacobsen*, 131 F. Supp. 3d 656, 669 (S.D. Tex. 2015) (citing *In re* Powers v. Caremark Inc., 261 Fed. Appx. 719, 721 (5th Cir. 2008)). The Court has already addressed Sea Wasp's arguments surrounding Domain Protection's standing to assert its TTLA claim. *See* Dkt. #230 at pp. 6–11. It will not do so again.[7]

---

[6] Defendants argue that Domain Protection must legally or rightfully possess the Domain Names to have standing in this case. Specifically, Defendants claim that Katz did not have authority to transfer the Domain Names to Domain Protection and thus Domain Protection cannot show the invasion of a legally protected interest. Domain Protection, however, has carried its 12(b) burden by alleging that it is the owner of the Domain Names which is all that is required for the Court's standing analysis at this stage. Accordingly, any arguments by Defendants surrounding Domain Protection's ownership, or lack thereof, for each cause of action are irrelevant.

[7] The Court's analysis in that opinion was in greater depth because the merits of standing had to be addressed under the preliminary injunction standard. Here, because this is a 12(b) standing inquiry, the pleadings govern the Court's analysis. With that being said, the "new evidence" presented by Sea Wasp does not change the Court's analysis. *See* Dkt. #230 (stating "The Fifth Circuit and Texas Supreme Court are clear. If one party has assigned property to another—without authority to do so or in breach of a fiduciary duty—the assignment is *voidable* in a suit by the principal . . . . This means that, *until Quantec or another party successfully challenges the Assignment in a separate suit*, it remains presumptively valid.").

Accordingly, the Court finds that Domain Protection has carried its burden and established standing to sue under the Texas Theft Liability Act.

ii.     Interference with Contract

Under Texas law, interference with contract occurs when a contract exists, there is a willful, calculated, and intentional act of interference that is calculated to cause damage, and actual damages or loss proximately result. *See Holloway v. Skinner*, 898 S.W.2d 793, 795–96 (Tex. 1995); *Juliette Fowler Homes*, 793 S.W.2d 660, 664 (Tex. 1990); *Armendariz v. Mora*, 553 S.W.2d 400, 404 (Tex. Civ. App.—El Paso 1977, writ ref'd n.r.e.).

Domain Protection alleges that it "had contracts and prospective contracts to sell domain names . . . [along with] contracts with advertising services to receive advertising revenue from domain names . . . ." (Dkt. #93). Domain Protection claims that:

> The defendants interfered with the sale of domain names by locking the domain name registrant information and preventing transfer of the domain names to an authorized registrar. The defendants interfered with the contracts for advertising revenue by hijacking the 'DNS' records for the domain names and redirecting the domain names to the location chosen by the defendants, which then shared revenue from the domain names with the defendants.

(Dkt. #93). As a result of this alleged conduct, Domain Protection claims that Defendants' interference "was the proximate cause of actual damages and loss to Domain Protection LLC, in losing the income from domain sales and advertising revenue" (Dkt. #93). And that, "[t]he loss of income from sales and revenue is ongoing and exceeds $100,000.00." (Dkt. #93).

Domain Protection's allegations establish Article III standing to sue under Texas law for interference with contract. Domain Protection has demonstrated a concrete, particularized, and actual injury by alleging that Defendants have intentionally interfered with Domain Protections contracts and cost them over $100,000 in damages. *Lujan*, 504 U.S. at 560–61. Domain Protection has a personal stake in this dispute given that Domain Protection claims ownership over the

Domain Names and the contracts surrounding them. *See Raines*, 521 U.S. at 819. Further, Defendant's alleged conduct is directly traceable to them. Indeed, Domain Protection claims that Defendants are the registrar of the Domain Names and are the ones who placed the executive lock on the Domain Names. *Lujan*, 504 U.S. at 560–61. Finally, the injury that Domain Protection claims can be easily redressed by a favorable decision by the Court. *Id.* Thus, at the 12(b)(1) stage, the Court holds that Domain Protection has standing to bring a cause of action under Texas law for interference with contract. *See Spokeo, Inc.*, 136 S.Ct. at 1548.

      iii.    Civil Conspiracy

Under Texas law, a civil conspiracy is "a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Triplex Communications, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995) (citing *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983); *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925 (Tex. 1979).

Domain Protection alleges that:

> The defendants, being two or more persons; and Baron or a confederate thereof, had the object to prevent Domain Protection's control over the domain names subject of this suit and had a meeting of minds on the object or on a course of action and in furtherance thereof engaged in the unlawful, overt acts complained of in this complaint with the damages detailed in this complaint being the proximate result. The defendants conspired to interfere with, and did, interfere with the business operations and contracts of Domain Protection, both of which actions are unlawful objectives pursuant to Texas law.

(Dkt. #93). As a result of this alleged conduct, Domain Protection claims that it "suffered actual damages from the conspiracy from the loss revenue of domain sales and the loss of advertising income . . . ." (Dkt. #93).

Domain Protection's allegations establish Article III standing to sue under Texas law for civil conspiracy. Domain Protection has demonstrated a concrete, particularized, and actual injury by alleging that Defendants conspired to interfere with Domain Protections business operations

and contracts by placing an executive lock on the Domain Names which resulted in Domain Protection suffering damages from lost revenue. *Lujan*, 504 U.S. at 560–61. Domain Protection has a personal stake in this dispute given that Domain Protection claims ownership over the Domain Names and the contracts surrounding them. *See Raines*, 521 U.S. at 819. Further, the alleged conduct is directly traceable to Defendants. Specifically, Domain Protection claims that Defendants are the registrar of the Domain Names and are the ones who placed the executive lock on the Domain Names. *Lujan*, 504 U.S. at 560–61. Finally, the injury that Domain Protection claims can be easily redressed by a favorable decision by the Court. *Id.* Thus, at the 12(b)(1) stage, the Court holds that Domain Protection has standing to bring a cause of action under Texas law for civil conspiracy. *See Spokeo, Inc.*, 136 S.Ct. at 1548.

iv.     Conversion

Under Texas tort law, "[c]onversion is the wrongful exercise of dominion or control over the property of another in denial of, or inconsistent with, the other's rights in the property." *Robinson v. National Autotech, Inc.*, 117 S.W.3d 37, 40 (Tex. App.—Dallas 2003, no writ) (citing *Morey v. Page*, 802 S.W.2d 779, 786 (Tex. App.—Dallas 1990, no writ); *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 446 (Tex. 1971)).

Domain Protection alleges that it is the registrant of the Domain Names in question and that it is thus entitled to them. Despite Domain Protection allegedly having the sole proprietary interest in the Domain Names, Domain Protection claims, among other things, that:

> The defendants exercised control over the property inconsistent with the plaintiff's rights as an owner and prevented Domain Protection from registering the domain names with a registrar authorized by it, from controlling the domain names, from selling the domain names, and from receiving advertising revenue from the domain names. The defendants' imposing Sea Wasp as the registrar of the domain names, locking the names from transfer to another registrar, and finally, in seizing control of the domain names, was an exercise of control in violation of and inconsistent with Domain Protection's rights.

(Dkt. #93). As a result of this alleged conduct, Domain Protection claims that Defendant's interference converted Domain Names worth over $10,000,000 (Dkt. #93).

Domain Protection's allegations establish Article III standing to sue under Texas law for conversion. Domain Protection has demonstrated a concrete, particularized, and actual injury by alleging that Defendants have exercised control over Domain Protection's property and in so doing converted over $10,000,000 worth of Domain Names. *Lujan*, 504 U.S. at 560–61. Domain Protection has a personal stake in this dispute given that Domain Protection claims ownership over the Domain Names and the contracts surrounding them. *See Raines*, 521 U.S. at 819. Further, the alleged conduct is directly traceable to Defendants. Indeed, as previously stated, Domain Protection claims that Defendants are the registrar of the Domain Names and have placed the executive lock on the Domain Names. *Lujan*, 504 U.S. at 560–61. Finally, the injury that Domain Protection claims can be easily redressed by a favorable decision by the Court. *Id.* Thus, at the 12(b)(1) stage, the Court holds that Domain Protection has standing to bring a cause of action under Texas law for conversion. *See Spokeo, Inc.*, 136 S.Ct. at 1548.

v. Stored Communications Act

The Stored Communications Act, 18 U.S.C. § 2701(a)(1–2) provides:

Except as provided in subsection (c) of this section whoever--(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system shall be punished as provided in subsection (b) of this section.

*Id.*[8] The definition of electronic "communication" is found in 18 U.S.C. § 2510.[9] Section 2510(1) defines "wire communication" as:

---

[8] 18 U.S.C. § 2707 provides a civil cause of action for any "provider of electronic communication service, subscriber, or other person aggrieved by any violation of this chapter . . . ."

[9] 18 U.S.C. § 2711(1) states that "the terms defined in section 2510 of this title have, respectively, the definitions given such terms in that section."

any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of such connection in a switching station) furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate or foreign communications or communications affecting interstate or foreign commerce.

*Id.* Section 2510(12)(A–D) defines "electronic communication" as:

any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectric or photooptical system that affects interstate or foreign commerce, but does not include--(A) any wire or oral communication; (B) any communication made through a tone-only paging device; (C) any communication from a tracking device (as defined in section 3117 of this title); or (D) electronic funds transfer information stored by a financial institution in a communications system used for the electronic storage and transfer of funds.

*Id.*

Domain Protection alleges that Defendants "intentionally accessed, without authorization, a facility through which an electronic communication service was provided; and exceeded any authorization to access that facility, and altered and prevented access authorized by Domain Protection to the electronic communication while it is in electronic storage in such system" (Dkt. #93). As a result of Defendants alleged conduct, Domain Protection claims that it has been personally aggrieved and lost control "over tens of thousands of Domain Name assets, lost sales of domain names, and lost revenue from domain name advertising" (Dkt. #93).

Domain Protection's allegations establish Article III standing to sue under the Stored Communications Act. Domain Protection has demonstrated a concrete, particularized, and actual injury by alleging that Defendants intentionally accessed a facility in which Domain Protection stored its Domain Names. In so doing, Domain Protection alleges that that Defendants prevented "the authorized access to that electronic communication and storage system" and thus prevented Domain Protection from accessing its Domain Names. This allegedly resulted in the "loss of control over tens of thousands of Domain Name assets, lost sales of domains names, and lost

revenue from domain name advertising." *Lujan*, 504 U.S. at 560–61. Moreover, Domain Protection has a personal stake in this dispute given that Domain Protection claims ownership over the Domain Names and alleges that it was seeking a service from the electronic and communication system of Verisign, Inc., (Dkt. #93) as required under 18 U.S.C. § 2707. *See Raines*, 521 U.S. at 819. Further, the alleged conduct is directly traceable to Defendants. To be sure, Domain Protection claims that Defendants are the ones who impermissibly accessed the electronic communication and storage system at Verisign, Inc., and tampered with Domain Protection's Domain Names thus preventing Domain Protection from accessing them. *Lujan*, 504 U.S. at 560–61. Finally, the injury that Domain Protection claims can be easily redressed by a favorable decision by the Court. *Id.* Thus, at the 12(b)(1) stage, the Court holds that Domain Protection has standing to bring a cause of action under Texas law for interference with contract. *See Spokeo, Inc.*, 136 S.Ct. at 1548.

Because Defendant's challenge to standing arises under Rule 12(b)(1), and thus the pleadings are the only relevant inquiry, the Court finds that Plaintiff has carried its burden as to each cause of action. Domain Protection has thus established Article III standing to bring the present action. Accordingly, Defendants' Motion to Dismiss for Lack of Standing (Dkt. #253) is denied as moot while Defendants' Motion to Extend Page Limit for Reply in Support of Motion to Dismiss for Lack of Standing (Dkt. #247) is granted.

III.    Motion to Dismiss for Lack of Personal Jurisdiction

According to Domain Protections' Amended Complaint:

liability is asserted against defendants Faia and Decossas for the actions complained of by Sea Wasp; and the corporate fiction of Sea Wasp's technical structure as a limited liability company should be disregarded and the above delineated claims are asserted against defendants Faia and Decossas in their personal capacities because the corporate fiction of Sea Wasp was resorted to as a means of evading an existing legal obligation, was relied

23

upon as a protection of crime, and was relied upon by the defendants to justify the wrongs alleged against Sea Wasp in this complaint.

(Dkt. #93).

As previously stated, the Texas long-arm statute confers jurisdiction to the limits of due process under the Constitution. *See Command-Aire Corp.*, 963 F.2d at 93. Therefore, the sole inquiry for the Court is whether personal jurisdiction offends or comports with federal constitutional guarantees. *See Bullion*, 895 F.2d at 216. Here, Domain Protection asserts that the Individual Defendants are amenable to the Court's jurisdiction because the corporate fiction encapsulating Sea Wasp should be disregarded. Specifically, Domain Protection alleges that the corporate fiction here was: "(1) resorted to as a means of evading an existing legal obligation; (2) relied upon as a protection of crime; or (3) relied upon to justify a tort" (Dkt. #181). Domain Protection, in an ambiguous manner, also asserts an alter ego basis for personal jurisdiction and a general jurisdiction basis through an incorporating clause in its Amended Complaint (Dkt. #93, ¶¶1.2–1.3). Finally, in Plaintiff Domain Protection's Response to Motion to Dismiss for Lack of Personal Jurisdiction by Individual Defendant's Venon Decossas and Gregory Faia (Dkt. #181), Domain Protection alleges that the Court has personal jurisdiction over the Individual Defendants due to *Calder* contacts. The Individual Defendants counter that personal jurisdiction is lacking under each of these theories and accordingly file a Motion to Dismiss (Dkt. #173). In response, Domain Protection requested leave to conduct additional discovery on the factual issues surrounding the Motion to Dismiss (Dkt. #181). Because the Court finds that Domain Protection has alleged sufficient facts to find that Sea Wasp's contacts should be imputed to the Individual Defendants under *Castleberry*, the Court need not consider the remainder of Domain Protection's arguments for personal jurisdiction or grant leave to conduct additional discovery.

i.    Corporate Fiction

"The complementary theories of limited liability and piercing the corporate veil have provoked consternation among courts and legal scholars alike. They have been variously described as a "legal quagmire," Ballantine, *Separate Entity of Parent and Subsidiary Corporations,* 14 CALIF. L. REV. 12, 15 (1925), and as being "enveloped in the mists of metaphor." *United States v. Jon-T Chems., Inc.*, 768 F.2d 686, 691–92 (5th Cir. 1985) (citing *Berkey v. Third Avenue Ry.*, 244 N.Y. 84, 155 N.E. 58, 61 (1926) (Cardozo, J.)). The alter ego doctrine and *Castleberry* doctrine lie deep within these mists and are only used in exceptional cases. *See Jon-T Cherns., Inc.*, 768 F.2d at 691 (citing *In re* Multiponics, Inc., 622 F.2d 709, 724–25 (5th Cir. 1980)). Under the alter ego doctrine, the corporate veil may be pierced, and thus limited liability may be disregarded, when "the separate personalities of the corporation and the individual no longer exist." Note, *Piercing the Corporate Law Veil: The Alter Ego Doctrine Under Federal Common Law*, 95 HARV. L. REV. 853 (1982). Under Texas law, however, the alter ego doctrine is only one means to disregard the corporate fiction. *See Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986). Indeed, various other theories may be employed to disregard the corporate form including:

> (1) when the fiction is used as a means of perpetrating fraud; (2) where a corporation is organized and operated as a mere tool or business conduit of another corporation; (3) where the corporate fiction is resorted to as a means of evading an existing legal obligation; (4) where the corporate fiction is employed to achieve or perpetrate monopoly; (5) where the corporate fiction is used to circumvent a statute; and (6) where the corporate fiction is relied upon as a protection of crime or to justify wrong.

*Zahra Spiritual Trust v. US*, 910 F.2d 240, 243 (5th Cir. 1990) (discussing *Castleberry*, 721 S.W.2d at 272). *Castleberry*, like the aforementioned doctrines, did not come without consternation. The Fifth Circuit, in order to relieve some of that confusion, refined *Castleberry* into three categories. As the Fifth Circuit stated:

> To better understand *Castleberry*, we have interpreted the case as establishing three broad categories in which a court may pierce a corporate veil: (1) the corporation is the alter ego

of its owners and/or shareholders; (2) the corporation is used for illegal purposes; and (3) the corporation is used as a sham to perpetrate a fraud.

*see also Western Horizontal Drilling, Inc. v. Jonnet Energy Corp.*, 11 F.3d 65, 67–68 (5th Cir. 1994) (citing *Villar v. Crowley Maritime Corp.*, 990 F.2d 1489, 1496 (5th Cir. 1993); *Fidelity & Deposit Co. v. Commercial Casualty Consultants, Inc.*, 976 F.2d 272, 274–75 (5th Cir. 1992)). These theories, like alter ego, apply to both corporations and limited liability companies alike. *See TransFirst Group, Inc. v. Magliarditi*, 237 F. Supp. 3d 444, 455 (N.D. Tex. 2017). Should a court find that one of these theories applies, and that the corporate fiction should thus be disregarded, the corporations contacts will be imputed to its shareholders, successors, or other relevant actors. *See Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 654 (5th Cir. 2002).

Here, Domain Protection maintains that three of the above theories support personal jurisdiction over the Individual Defendants. In Paragraph 1.3 of its Amended Complaint, Domain Protection states:

> [T]he corporate fiction of Sea Wasp's technical structure as a limited liability company should be disregarded . . . because the corporate fiction of Sea Wasp was [1] resorted to as a means of evading an existing legal obligation, [2] was relied upon as a protection of crime, and [3] was relied upon by the defendants to justify the wrongs alleged against Sea Wasp in this complaint . . . .

Dkt. #93 (emphasis added). The Court now addresses each of argument for personal jurisdiction.

a.   Evading an Existing Legal Obligation

Domain Protection first claims that the Individual Defendants are amenable to the Court's jurisdiction because they used Sea Wasp to evade an existing legal obligation. According to *Gibraltar v. LDBrinkman Corp.*, "[a]s with "alter ego" proper, the focus [of this strand] is on the relationship between and among the corporation, its owners, and the laws of the state rather than on the relationship between the claimant and the corporation." 860 F.2d 1275, 1288. Using the corporate fiction to evade an existing legal obligation falls within two of the overarching categories

established by the Fifth Circuit: "Illegal Purpose" and "Sham to Perpetrate a Fraud." *See Pan Eastern Exploration Co.*, 855 F.2d at 1131; *Gibraltar Savings*, 860 F.2d at 1289.

Domain Protection alleges that:

> [T]he defendants Faia and Decossas used Sea Wasp as a means of evading the legal obligations of the registrar Fabulous.com, Australia [Sea Wasp's predecessor], which obligations were due Domain Protection as the registrant of Domain Protection's domain names, by imposing Sea Wasp, a shell entity, as a successor registrar without the knowledge or consent of Domain Protection, and then using Sea Wasp to evade the legal obligations, then existing, which were owed to the domain name registrant, Domain Protection.

Dkt. #93. Under ICANN policy, Sea Wasp became the registrar of all Domain Names held by its predecessor, Fabulous.com, Australia. (Dkt. #188) (citing Dkt. #54). This transfer occurred after the two entities consummated an allegedly arms-length transaction whereby Sea Wasp purchased all Fabulous.com, Australia's assets including the ICANN Registrar Accreditation Agreement. Fabulous.com, Australia's assets also included the Domain Names registered in Domain Protection's name. Domain Protection alleges that Sea Wasp was created, and these transactions took place, so that Sea Wasp could "seize control over the registrar functions without the consent of the domain name registrants who contracted with Fabulous.com to handle the registrar functions for their domain names" (Dkt. #181). Consequently, Domain Protection argues, Sea Wasp was used to avoid the obligations that Fabulous.com, Australia had under the UDRP and a Court Order.

As to the "Court Order," Domain Protection merely attaches an email paraphrasing the Order which directs the Receiver to return all assets to Katz (Dkt. #181, Exhibit 42) and a one sentence excerpt from the Order (Dkt. #181, Exhibit 44). The Order does not, as Domain Protection alleges, mandate that Fabulous.com, Australia follow Katz' instructions. Rather, it directs the *Receiver* to return all of Baron's receivership assets to Katz. Further, even if the Court Order did mandate that Fabulous.com, Australia follow Katz directions, that mandate did not apply

to *Sea Wasp*. For these reasons, Domain Protection has not established a *prima facie* case that Sea Wasp was used to thwart a Court Order. *Zahra Spiritual Trust*, 910 F.2d at 243.

As to the UDRP, Domain Protection alleges that Sea Wasp was used to evade existing legal obligations. These "existing legal obligations," however, are nowhere to be found. First, the alleged obligations did not belong to Sea Wasp or to the Individual Defendants; they belonged to Fabulous.com, Australia. Thus, if any party was avoiding existing legal obligations, it was Fabulous.com, Australia. Second, Domain Protection's attempts to simply rehash factual allegations without any mention as to which *specific* legal obligations Sea Wasp violated does not suffice. *Gibraltar*, 860 F.2d at 1288. Third, even if Domain Protection alleged an existing legal obligation between the two parties, it is doubtful that a *Castleberry* contemplated a private, contractual legal obligation when discussing legal obligations. *See In re JNS Aviation, LLC*, 376 B.R. 500, 530 (Bankr. N.D. Tex. 2007), *aff'd*, 395 F. App'x. 127, 158 (5th Cir. 2010) ("The illegal purpose doctrine is described as relating to the use of a corporate forum as a technique for avoiding legal limitations upon natural persons or corporations. 15 TEX. JUR.3d *Corporations* § 174 (2007) citing *Pan Eastern Exploration Co. v. Hufo Oils,* 855 F.2d 1106 (5th Cir.1988). The focus is on obligations or limitations imposed by the state. It does not appear to address obligations arising as a result of a contract between two parties as in the instant case."). Domain Protection has the burden to establish a *prima facie* case supporting personal jurisdiction over the Individual Defendants. *See Atlas Copco AB*, 205 F.3d at 215. It is not the Court's job to carry that burden for Domain Protection. *Id.* Domain Protection failed to establish what existing legal obligation— that actually belonged to the Individual Defendants or Sea Wasp—that Sea Wasp was used to evade. And even if Domain Protection had alleged an existing legal obligation, a contractual obligation is not contemplated by *Castleberry*. *See In re* JNS Aviation, LLC, 376 B.R. at 530.

Further, the Court Order Domain Protection cites does not stand for the proposition that Domain Protection claims it stands for. Consequently, the Court finds that Sea Wasp was not used to evade an existing legal obligation.

b. Relying Upon as a Protection of Crime & to Justify a Tort

Domain Protection next claims that the Individual Defendants are amenable to the Court's jurisdiction because they relied upon Sea Wasp as a protection of crime or to justify a tort or wrong. According to *Pan Eastern Exploration Co. v. Hufo Oils*, "[t]he only limitation on [these] broad strand[s] of corporate disregard is that the focus is on injustice or unfairness *to the claimant caused by the corporation and its owners.*" 855 F.2d 1106, 1133 (5th Cir. 1988) (superseded on other grounds). *Gibraltar Savings* adds to the analysis of these *Castleberry* strands stating that:

> The [*Castleberry*] court emphasized that this standard for corporate disregard is whether honoring legal independence would result in "inequity" or "injustice"; the purpose "is to prevent use of the corporate entity as a cloak for fraud or illegality or to work an injustice, and that purpose should not be thwarted by adherence to any particular theory of liability."

*Gibraltar Savings*, 860 F.2d at 1289 (citing *Castleberry*, 721 S.W.2d at 273). Using the corporate fiction as protection of crime or to justify wrong falls within the overarching third category, as established by the Fifth Circuit, of "Sham to Perpetrate a Fraud." *See Pan Eastern Exploration Co.*, 855 F.2d at 1131; *see also Gibraltar Savings*, 860 F.2d at 1289 ("Elements of this strand can be found '(3) where the corporate fiction is resorted to as a means of evading an existing legal obligation' and '(6) where the corporate fiction is relied upon as a protection of crime or to justify wrong.'"). For this reason, these strands will be analyzed together.

Domain Protection alleges, in relevant part, that: "Defendants Faia and Decossas relied upon the corporate fiction of Sea Wasp as protection of the crime of Theft, detailed below in Count I, and to justify the torts asserted in Counts II–V" (Dkt. #93). Sea Wasp responds that it placed an executive lock on the Domain Names so that it could refuse releasing the Domain Names "to a

party under a definite cloud of criminal suspicion" (Dkt. #188). As the Court previously stated, it is the burden of Domain Protection to establish a *prima facie* case supporting personal jurisdiction over the Individual Defendants. *Atlas Copco AB*, 205 F.3d at 215. In considering the Individual Defendants' Motion, all allegations in Domain Protection's Amended Complaint must be taken as true "except to the extent that they are contradicted by defendant's affidavits." *Int'l Truck & Engine Corp. v. Quintana*, 259 F. Supp. 2d 553, 557 (N.D. Tex. 2003) (citing *Wyatt v. Kaplan*, 686 F.2d 276, 282–83 n.13 (5th Cir. 1982)); *accord Black v. Acme Mkts., Inc.*, 564 F.2d 681, 683 n.3 (5th Cir. 1977). Defendant's affidavits do not rebut any of the allegations made by Domain Protection; rather, they focus exclusively on rebutting the alter ego doctrine. In Domain Protection's allegations, Domain Protection claims that Sea Wasp is a "shell entity" which was used to further a civil conspiracy, interfere with Domain Protection's contract, and commit theft, conversion, and a violation of the Stored Communications Act (Dkt. #93). Specifically, Domain Protection maintains that Faia and Decossas used Sea Wasp to register themselves as Registrar over the Domain Names so that they could lock the Domain Names, change the DNS records, and thus prevent Domain Protection from controlling, selling, or receiving advertising revenue from the Domain Names (Dkt. #93). Put simply, Domain Protection alleges that the Individual Defendants created Sea Wasp so that Sea Wasp could "seize control over the registrar functions without the consent of the domain name registrants who contracted with Fabuluous.com to handle the registrar functions for their domain names" (Dkt. #181). The Individual Defendants effectively remain silent on this front.

In its Motion, the Individual Defendants do not persuasively rebut any of these claims. Rather, the Individual Defendants hurl accusations at Domain Protection and claim that, if any party engaged in any inequitable conduct, it was Domain Protection (Dkt. #173). Additionally,

the Individual Defendants include three brief sentences whereby they claim that any actions taken by themselves and Sea Wasp were done in "good faith" to prevent Domain Protection's potentially criminal conduct (Dkt. #188). Such arguments do not defeat any allegations made by Domain Protection. Taking Domain Protection's allegations as true at this stage, *Quintana*, 259 F. Supp. 2d at 557, and noting that the Individual Defendants have not provided any contradictory affidavits, *id.*, it is evident that Domain Protection has pleaded sufficient facts to demonstrate that honoring the "legal independence" of the Individual Defendants would result in "inequity" or "injustice." *See Gibraltar Savings*, 860 F.2d at 1289. Domain Protection alleges that Sea Wasp was nothing more than a shell entity which was used to accomplish the ostensibly unlawful and/or tortious conduct that the Individual Defendants purportedly wanted to engage in. It would be inequitable to allow Sea Wasp to "cloak" or shield the Individual Defendants from the consequences of such alleged actions. Further, the Individual Defendants do not assert that it would be unfair or unreasonable for the Court to exercise jurisdiction over them. *See Burger King*, 471 U.S. at 477; *Seiferth*, 472 F.3d at 271.

Under Rule 12(b)(2), the Court finds that it is in the interest of equity to pierce the corporate veil for personal jurisdiction purposes. The contacts of Sea Wasp are accordingly imputed onto the Individual Defendants. *See Patin*, 294 F.3d at 654. Because Sea Wasp submitted to the personal jurisdiction of the Court, the Individual Defendants are within the personal jurisdiction of the Court. *Id.* Consequently, the Court need not address Domain Protection's other personal jurisdiction arguments, nor permit additional discovery by Domain Protection, having found that the requirements for personal jurisdiction were met under *Castleberry*. *See Castleberry*, 721 S.W.2d at 272. The Individual Defendants Motion to Dismiss for Lack of Personal Jurisdiction is accordingly denied.

IV.    Motion to Dismiss Pursuant to Rule 17

Sea Wasp has consistently failed, or refused, to raise timely arguments.  Such is the case yet again.  The Court entered its original Scheduling Order on December 20, 2018 (Dkt. #65).  The Court's Order stated that motions to dismiss, motions for summary judgment, or other dispositive motions were due by April 10, 2019 (Dkt. #65).  On April 10, 2019, however, the Court entered an Order granting Sea Wasp's Motion for Extension of Time (Dkt. #115).  The Order extended the time to file dispositive motions to May 1, 2019 (Dkt. #115).  Sea Wasp claims that its Motion to Dismiss Pursuant to Rule 17(a) could not be "reasonably" filed "early"—or, more aptly described, within the time allotted for dispositive motions.  Such an argument, when considered along with Sea Wasp's other dilatory arguments and filings, is unpersuasive.

Sea Wasp claims that it was unable to determine the "real parties in interest" in this case because it was unable to depose Lisa Katz until May 31, 2019.  To illustrate its alleged inability to timely depose Katz, Sea Wasp points to three of the Court's Orders granting Motions to Compel.  Those Orders include Dkt. #148, Dkt #153, and Dkt. #155.  Sea Wasp states in its brief that the Court has "thrice ordered [Katz] deposition" (Dkt. #180).  That is not true.  The Court's Order and Amended Order in Dkt. #148 and Dkt. #153 do not address the deposition of Katz.  Further, Dkt. #155 orders Katz to answer questions and to proceed with the *already occurring* deposition at an agreeable time.  It is never wise to misconstrue a Court's ruling, and it is even less wise to misconstrue a Court's ruling back to itself.  Sea Wasp and Domain Protection have consistently blurred the lines between permissible advocacy and antagonistic, unbecoming behavior.  The Court will not tolerate such conduct.  *See* LOCAL RULE AT-3(k).  Removing the half-truths that Sea Wasp paints, the actual picture becomes much clearer.  Sea Wasp did not depose Katz until May 31, 2019.  This was thirty days *after* the Court's amended deadline to submit any dispositive

motions and nearly a year into this litigation.  Further, any actual motions to compel the deposition of Katz were filed *after* the Court's deadline for dispositive motions (Dkt. #221).  Thus, Sea Wasp failed to abide by the Court's deadline for dispositive motions, motions to dismiss, and motions for summary judgment.

In addition to Sea Wasp's disregard for the Court's Scheduling Order, Sea Wasp waived its ability to contest who the real party in interest is.[10]  The factors enumerated in *In re* Signal Intern., LLC compel this conclusion.

i.    Knowledge of the facts that gave rise to the issue with Domain Protection's interest in this action.

Sea Wasp waited over one year to raise any issue with Domain Protection's interest in this action.  Sea Wasp could have discovered the alleged facts—which Domain Protection claims are false—long before it did.  Yet, as has happened time and again in this case, Sea Wasp hurled accusations at Domain Protection demanding that the case be dismissed with little legal support. As the Court just discussed, Sea Wasp did not depose Katz until May 31, 2019.  This was thirty days *after* the Court's amended deadline to submit any dispositive motions.  Further, Sea Wasp's deposition of Katz was nearly a year into this litigation.  Finally, any actual motions to compel the deposition of Lisa Katz were filed *after* the Court's deadline for dispositive motions (Dkt. #221). Sea Wasp had plenty of time to ascertain the facts and develop any arguments relevant to this Motion.  Instead, Sea Wasp waited.  The standard as laid out in *In re* Signal Intern, LLC, is "whether the defendant knew *or should have known* about the facts giving rise to the plaintiff's disputed status . . . ."  579 F.2d at 488 (emphasis added).  Sea Wasp should have known about the

---

[10] While the Court will not delve into the merits, it is readily apparent that Domain Protection, as the LLC that serves as the registrant of the Domain Names, holds the substantive right to pursue the recoupment of those Domain Names.  Indubitably, even a cursory review of the Internet Corporation for Assigned Names and Numbers' (ICANN) Uniform Domain Name Dispute Resolution Policy (UDRP) elicits the conclusion that a registrant is entitled to control its domain names.

facts—which again are disputed—that would lead to it contesting Domain Protection's interest within the time allotted by the Court. When coupled with the untimeliness of Sea Wasp's objection, which is discussed below, waiver is all but inevitable.

        ii.     Timing of the Objection

The second and third factors state that the Court should consider "whether the objection was raised in time to allow the plaintiff a meaningful opportunity to prove its status; [and] whether it was raised in time to allow the real party in interest a reasonable opportunity to join the action if the objection proved successful." *In re* Signal Intern, LLC, 579 F.2d at 488. While the objection was raised "in time to allow the plaintiff a meaningful opportunity to prove its status," the objection was not "raised in time to allow the real party in interest a reasonable opportunity to join the action if the objection proved successful." *Id.* The Court's Scheduling Order unequivocally states that the deadline to add parties was February 13, 2019 (Dkt. #65). Domain Protection complied with the Scheduling Order when it filed its First Amended Complaint on February 13, 2019 adding Defendants Vernon Decossas and Gregory Faia to the lawsuit (Dkt. #93). Sea Wasp did not comply with the Scheduling Order. Nearly five months after the Court's deadline, Sea Wasp filed its Rule 17 Motion to Dismiss Regarding Real Party in Interest (Dkt. #180). This left the real party in interest—*if* there is one other than Domain Protection—zero opportunity to be added to the action. Sea Wasp implicitly recognizes this when it argues that the Court dismiss the case with prejudice rather than permit the interested party—again, *if* there is one other than Domain Protection—to join the lawsuit. Like the first factor, the third factor cuts against Sea Wasp's ability to contest Domain Protection's interest at this late stage.

### iii. Case-Specific Considerations

As already discussed, Sea Wasp has time and again disregarded the Court's Orders. While Domain Protection has also acted in an unbecoming manner on multiple occasions, the Court will not permit Sea Wasp to claim Domain Protection lacks an interest in this case based on disputed facts and little citation to supporting caselaw at this late hour.

Thus, in the interest of judicial efficiency, fairness to the parties, and upholding the Court's Scheduling Order, the Court holds that Sea Wasp has waived any argument surrounding the real party in interest.

## CONCLUSION

It is therefore **ORDERED** that:

- Motion to Dismiss for Lack of Personal Jurisdiction by Individual Defendants Vernon Decossas and Gregory Faia (Dkt. #173) is **DENIED**.

- Domain Protection's Request for Leave to Conduct Additional Discovery (Dkt. #181) is **DENIED**.

- Sea Wasp, LLC's Rule 17 Motion to Dismiss Regarding Real Party in Interest (Dkt. #180) is **DENIED**.

- Defendants' Motion to Dismiss for Lack of Standing (Dkt. #228) is **DENIED**.

- Defendants' Motion to Extend Page Limit for Reply in Support of Motion to Dismiss for Lack of Standing (Dkt. #247) is **GRANTED**.

- Defendants' Motion to Schedule Hearing on Defendants' Motion to Dismiss for Lack of Standing (Dkt. #253) is **DENIED** as moot.

**IT IS SO ORDERED**.

 **SIGNED this 15th day of October, 2019.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE