# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| DOMAIN PROTECTION, LLC, | § | |
| *Plaintiff,* | § | |
| v. | § | Civil Action No. 4:18-cv-792 |
| | § | Judge Mazzant |
| SEA WASP, LLC, ET. AL. | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiff Domain Protection's First Motion for Partial Summary Judgment (Dkt. #123); Plaintiff Domain Protection's Motion for Leave to File One Page of Sur-Sur-Reply Briefing in Support of its First Motion for Partial Summary Judgment (Dkt. #185); Sea Wasp, LLC's Opposed Motion to Supplement its Response to Plaintiff's First Motion for Partial Summary Judgment (Dkt. #319); and Sea Wasp, LLC's Amended Motion to Supplement its Response to Plaintiff's First Motion for Partial Summary Judgment (Dkt. #327). Having considered the motion and the relevant pleadings, the Court finds that each Motion is **GRANTED**—save the portion of Domain Protection's First Motion for Partial Summary Judgment (Dkt. #123) relating to tortious interference with a prospective contract which is **DENIED**.

## BACKGROUND

The internet is "an electronic communications network that connects computer networks and organized computer facilities around the world." *See Internet*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/Internet (last visited November 24, 2019). To access a website, users must connect their home computer to the one hosting the site. This is done by typing the website's "Internet Protocol Address" (the "IP Address")—a string of numbers that

identifies the computer where the website is housed—into Internet Explorer or another web browser. *See IP Address*, TECH TERMS COMPUTER DICTIONARY, https://techterms.com/definition/ip_address (last visited November 24, 2019) (listing "67.43.14.98" as an example). Because an IP address may be difficult to remember, website owners typically obtain an alpha-numeric "domain name" that users can type reach to their website and that might be easier to remember, such as "google.com." Put simply, an "IP address," is comparable to a nine-digit phone number and a "domain name" is comparable to the name saved on a cell phone for that number.

A party can secure the rights to use a particular domain name in one of two ways. It can register a brand-new domain name with a "registrar," the party responsible for maintaining the registration of domain names. Or, it can purchase an existing domain name from the party who has registered that name—also known as the "registrant" or "registered name holder." Registered name holders can earn money from the domain names in their possession by selling them or directing them to placeholder sites where ads are placed and monetized.

Domain Protection is the registered name holder for over 50,000 domain names (the "Domain Names") (Dkt. #123). Sea Wasp is the registrar over those names. This suit concerns whether Sea Wasp is encroaching on Domain Protection's proprietary interest in the Domain Names by turning the executive lock on them, which prevents Domain Protection from selling the Domain Names or updating their registration information. Sea Wasp insists that Domain Protection lacks any proprietary interest in the Domain Names in light of a dispute over their ownership (Dkt. #123, Dkt. #168).

A summary on how Domain Protection came into possession of the Domain Names may be helpful at this point. In February 2014, three parties filed suit in the Northern District of Texas

against Jeffrey Baron and one of his companies for misappropriating their domain names. The court found Baron to be a vexatious litigator and, on this basis, appointed a receiver (the "Receiver") over his assets while the dispute was pending (Dkt. #192). The court also placed assets belonging to Novo Point, LLC ("Novo Point") and Quantec, LLC ("Quantec") (collectively, the "LLCs'"), two limited liability companies with ties to Baron (Dkt. #168), in the Receiver's custody. The LLCs' assets included the Domain Names.

On appeal, Baron argued that the court lacked jurisdiction to enter the receivership order, and the Fifth Circuit agreed. This prompted the district court to unwind the receivership (the "Unwind Order") (Dkt. #54, Exhibit 17). Assets held in Baron's name would be returned to him. But it was not immediately apparent whom to return the LLCs' assets to in light of a dispute over who could properly act for them. Without resolving the dispute, the court directed the Receiver to return the Domain Names to Lisa Katz, the Local Operations Manager for the LLCs. Katz was entrusted to manage the LLCs' assets, including the Domain Names, until the dispute over control of the LLCs was resolved (Dkt. #123; Dkt. #168). Baron-affiliates Mike Robertson and David McNair (the "Baron Affiliates") tried to induce the registrar over the Domain Names, Fabulous.com ("Fabulous"), into giving them control of the Domain Names anyway. But the Receiver intervened, instructing Fabulous to handover the Domain Names to Katz, pursuant to the Unwind Order (Dkt. #123). Katz then assumed control over the Domain Names.

Katz explains that the LLCs had racked up substantial debt while they were under receivership, prompting creditors to threaten to place the LLCs in bankruptcy for liquidation (Dkt. #123). To prevent this, Katz assigned the Domain Names to Domain Protection, a company where she is also manager. The plan was for Domain Protection to liquidate the Domain Names as needed to pay off the LLCs' debts (Dkt. #123). But Baron had contemporaneously filed suits

in Texas and Australia challenging Katz's possession of the LLCs' assets. This prompted Fabulous to place an "executive lock" on the Domain Names while these actions were pending, which prevented Domain Protection from liquidating the Domain Names during the duration of the suits.

Neither suit was successful (Dkt. #123). In August 2017, after the suits had been dismissed, Domain Protection asked Fabulous to restore its access to the Domain Names. Sea Wasp purchased Fabulous roughly at the same time. While the Parties dispute what immediately followed, they agree that, "[a]t least between January 28, 2018 to February 11, 2018, there was not an 'Executive Lock' on the [D]omain [N]ames." (Dkt. #42 at p. 1). Domain Protection began managing the affairs over the Domain Names shortly after. It started by replacing Bidtellect as the advertisement revenue manager (the "Advertising Manager") for the Domain Names on receipt of a "concerning" letter from Bidtellect (Dkt. #123). Bidtellect was apparently exasperated with the series of disputes over the Domain Names and proposed certain non-negotiable terms to continue their contractual relationship. Domain Protection responded by terminating its contract with Bidtellect, contracting with a new Advertising Manager, and updating the registration information for the Domain Names accordingly. This involved updating the Domain Names' "nameserver records," which ensured that, when a user typed a Domain Protection domain name in a web browser, the user would be directed to a placeholder website hosted by the new Advertising Manager.

By late February 2018, two or three weeks after the lock was removed, Baron filed another suit (the "Underlying Dispute") challenging Katz's authority to transfer the Domain Names. *See In re Payne*, No. 16-04110 (Bankr. E.D. Tex. 2018). Domain Protection believes that Baron filed this suit simply to lock the Domain Names indefinitely, citing correspondence to that effect from Baron's attorneys (*see* Dkt. #54, Exhibit 28). Sure enough, Sea Wasp responded by reverting the

changes Domain Protection had made to the Domain Names' nameserver records and turning the executive lock back on. Domain Protection notes that Robertson, one of the Baron Affiliates who tried to take control of the Domain Names in violation of the Unwind Order, is now a principal or "key person" at Sea Wasp (Dkt. #54, Exhibit 31 at pp. 3–4).

Domain Protection has brought claims against Sea Wasp for tortious interference, civil conspiracy, conversion, and respective violations of the Texas Theft Liability Act and the Stored Communications Act (Dkt. #1). Domain Protection alleges that, by turning the lock back on, Sea Wasp is encroaching on its proprietary interests in the Domain Names since it cannot transfer them or update their nameserver records (Dkt. #1). Sea Wasp, however, insists that it can and must place a lock on the Domain Names while a dispute is pending, citing its obligations as a registrar accredited with the Internet Corporation for Assigned Names and Numbers ("ICANN"). ICANN-registrars must comply with ICANN's Registrar Accreditation Agreement (the "Accreditation Agreement"), which instructs registrars to maintain the status quo once a dispute arises (Dkt. #54, Exhibit 2 at p. 5). According to Sea Wasp, this means that it cannot allow Domain Protection to transfer the Domain Names while a dispute is pending. Domain Protection counters that ICANN's dispute resolution policy requires registrars to transfer domain names on "written or appropriate electronic **instruction from [the registrar] to take such action**"—even after a dispute has started (Dkt. #54, Exhibit 2 at p. 5) (emphasis in original). Notably, on July 17, 2019, the Court entered a Preliminary Injunction which enjoined Sea Wasp from "interfering with Domain Protection's control over the Domain Names, including its ability to update the nameserver records associated with the Domain Names" (Dkt. #192).

On May 1, 2019, Domain Protection filed Plaintiff Domain Protection's First Motion for Partial Summary Judgment (Dkt. #123). In its Motion, Domain Protection asserts that Sea Wasp

"listed itself as the 'registrar' of tens of thousands of domain names registered to Domain Protection" (Dkt. #123) (citing Exhibit 151). Sea Wasp, Domain Protection continues, then "hijacked all income and email from Domain Protection's domain names and websites by altering the domain names' nameserver records" (Dkt. #123) (citing Exhibit 151). Domain Protection contends that Sea Wasp, as the registrar of the Domain Names, violated certain ICANN rules and thus acted outside of its legal authority (Dkt. #123). In so doing, Sea Wasp allegedly committed conversion, tortious interference, civil conspiracy and respective violations of the Texas Theft Liability Act and Stored Communications Act (Dkt. #123). Domain Protection accordingly has presented the following issue to the Court: Whether a domain name registrar such as Sea Wasp is authorized under the ICANN rules to become involved in purported domain name ownership disputes and to alter a registrant's domain name nameserver records without the registrant's consent (or the order of a court or administrative panel) (Dkt. #123). An affirmative resolution of this issue, Domain Protection contends, will result in a partial summary judgment for Domain Protection as Sea Wasp will consequently have been found to have acted outside the scope of its legal authority as a registrar, thus establishing its liability for the aforementioned causes of action (Dkt. #123). Sea Wasp opposes Domain Protection's Motion (Dkt. #168).

On June 20, 2019, Sea Wasp filed Sea Wasp LLC's Response to Domain Protection, LLC's First Motion for Partial Summary Judgment (Dkt. #168). In its Motion, Sea Wasp avers that Domain Protection is "wrong on the law and material underlying facts are disputed" (Dkt. #168). After reiterating a list of grievances that Sea Wasp holds with Domain Protection's alleged conduct during discovery, as well as enumerating a list of already filed Motions, Sea Wasp provides the following arguments against the Court's granting of summary judgment (Dkt. #168). First, Sea Wasp argues that the Court may not rely on the declaration provided by Katz ("Katz' Declaration")

which Domain Protection relies upon for its Motion for Partial Summary Judgment (Dkt. #168).

Specifically, Sea Wasp argues that, because Katz is a fiduciary of Quantec—the LLC from which

Katz transferred the Domain Names to Domain Protection—Katz' self-interest "triggers a negative

legal presumption that she violated her fiduciary duty in transferring the Quantec assets . . . ."

(Dkt. #168). As such, the Court should not give any weight or credence to Katz' Declaration, Sea

Wasp argues (Dkt. #168). Sea Wasp also contends that Katz' Declaration is filled with conclusory,

ambiguous language that is not tied to demonstrable facts (Dkt. #168). Second, Sea Wasp

maintains that Domain Protection has no realistic claim to clear title (Dkt. #168). Accordingly,

Sea Wasp claims that "[n]o clear title means no standing and no right of recovery under statute or

tort" (Dkt. #168). Third, Sea Wasp demurs that Domain Protection waived its right to recover

because: (1) Domain Protection and Schepps have purportedly thwarted the discovery process;

and (2) Domain Protection acquiesced to the lock formerly enabled by Fabulous (Dkt. #168).

Finally, Sea Wasp claims that under ICANN policy and procedure, Sea Wasp, as registrar of the

Domain Names, has effective immunity as a stakeholder (Dkt. #168). This immunity, Sea Wasp

continues, exists because Sea Wasp was presented with multiple claims to the Domain Names and

thus was permitted to refuse the release of the executive lock under § 3.7 of ICANN Inter-Registrar

Transfer Policy (Dkt. #168). Other than its previously mentioned defenses, Sea Wasp does not

contest the underlying facts that Domain Protection proffers; namely, that Domain Protection was

in possession of the Domain Names, Sea Wasp placed an executive lock on those Domain Names,[1]

and, as a result, Domain Protection no longer could access the Domain Names.

---

[1] Sea Wasp provides the following defense for its placing the executive lock on the Domain Names in footnote 24 of its Response:

> At the end of January 2018 and unbeknownst to Sea Wasp, the Lock was briefly removed outside of Sea Wasp's system, thus enabling unauthorized changes to the name servers of the domain name portfolio. During this time, a third-party company called eNom, Inc. ("eNom") was handling customer support for the portfolio. Sea Wasp believes that Plaintiff assisted in having eNom release the Lock and allowing name

On June 27, 2019, Domain Protection filed Plaintiff Domain Protection's Reply in Support of Motion for Partial Summary Judgment (Dkt. #177). In its Reply, Domain Protection provides the following counter-arguments: (1) Sea Wasp offers no legal support for its negative-presumption theory of Katz' Declaration and fails to "point to any relevant part of the declaration that is ambiguous or conclusory"; (2) even if Katz' Declaration was stricken by the Court, Sea Wasp's judicial admissions provide sufficient facts for the Court and Sea Wasp has not controverted any of those facts in its Response; (3) Sea Wasp cannot challenge the assignment of the Domain Names as a third party; rather, that assignment may only be voided "by suit brought by the principal to whom the fiduciary duty is owed"; (4) Domain Protection did not waive its right to recover; and (5) Sea Wasp is mistaken on the law of immunity (Dkt. #177).

Following Domain Protection's Reply, Sea Wasp filed Sea Wasp, LLC's Sur-Reply to Domain Protection, LLC's First Motion for Partial Summary Judgment (Dkt. #179). In its Sur-Reply, Sea Wasp argues that Katz is not a credible witness because Sea Wasp's own witnesses, Jeffrey Rasansky and Christopher A. Payne, provide counter-testimony that they never threatened Quantec with bankruptcy despite Katz' allegations that they did (Dkt. #179). Accordingly, Sea Wasp argues that "no summary judgment may safely be granted based on her [Katz] wounded credibility" (Dkt. #179). Sea Wasp then argues that *Nobles v. Marcus*, a case Domain Protection relies upon for its argument that only a principal may challenge an assignment, is inapplicable.

On July 10, 2019, Domain Protection filed two motions. First, Domain Protection filed Plaintiff Domain Protection's Motion for Leave to File One Page of Sur-Sur-Reply Briefing in

---

server changes. After discovering the unauthorized name server changes on the domain names, Sea Wasp reversed those changes, and restored the pre-existing Lock. Sea Wasp did not change, but rather effectuated the pre-existing *status quo* by correcting back to the same setting and name server data on the portfolio in effect prior to Sea Wasp's purchase of Fabulous.

(Dkt. #168). Irrespective of how Sea Wasp describes its placing of the executive lock on the Domain Names, the lock was at one point non-existent, and at the next point in place. Semantics do not change these facts.

Support of its First Motion for Partial Summary Judgment (Dkt. #185). Second, Domain Protection filed Plaintiff Domain Protection's Sur-Sur-Reply in Support of Motion for Partial Summary Judgment (Dkt. #186). In its substantive Motion, Domain Protection argues that Katz never proclaims in her declaration that Payne and Rasansky threatened to put Quantec into bankruptcy; thus, Domain Protection continues, this defense by Sea Wasp is irrelevant (Dkt. #186). Domain Protection then argues that the Court may not make a credibility determination of Katz' testimony (Dkt. #186).

On November 27, 2019, Sea Wasp filed Sea Wasp, LLC's Opposed Motion to Supplement its Response to Plaintiff's First Motion for Partial Summary Judgment (Dkt. #319). This Motion was followed by Sea Wasp, LLC's Amended Motion to Supplement its Response to Plaintiff's First Motion for Partial Summary Judgment (Dkt. #327) which was filed on December 6, 2019. In its Motions, Sea Wasp argues that "to the extent Plaintiff relies on claimed existing or future damages in its May 1 summary judgment motion [Dkt. #123], those alleged facts are, by judicial notice of the Court's own later order(s), superseded and no long[er] justify, if they ever did, a partial summary judgment" (Dkt. #319). Sea Wasp also claims that: "1) Plaintiff cannot receive more rights than Ms. Katz could give under Judge Sam Lindsay's February 28, 2014, order; and 2) Ms. Katz admits after anything that remained after the creditors were paid was to go back to Quantec" which makes Domain Protection not a "traditional" owner of the Domain Names (Dkt. #319). Further, Sea Wasp argues that Domain Protection cannot prove intent under the Texas Theft Liability Act to appropriate Domain Protection's property because Sea Wasp relied upon the advice of legal counsel (Dkt. #319). Finally, Sea Wasp argues that because Katz "could not quantify any damages, needs weeks or months to 'research' the matter, and couldn't provide any documentation for [her] assertions," Katz' uncertainty does not support a "conclusive

resolution of fact issues relating to ownership or possessory rights at the summary judgment stage" (Dkt. #319).

With all relevant facts now before the Court, the Court proceeds to Domain Protection's Motion for Partial Summary Judgment.

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Substantive law identifies which facts are material. *Id.* The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment." *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact. FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323. If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence

of evidence to support the nonmovant's case. *See Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49). A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment. *See Anderson*, 477 U.S. at 257. Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden. Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)). The Court must consider all of the evidence but "refrain from making any credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

Domain Protection presents the Court with the following issue: Whether a domain name registrar such as Sea Wasp is authorized under the ICANN rules to become involved in purported domain name ownership disputes and to alter a registrant's domain name nameserver records without the registrant's consent (or the order of a court or administrative panel) (Dkt. #123). Before the Court can proceed to the issue presented, it must first assess the validity of the defenses proffered by Sea Wasp. Namely, Sea Wasp's defenses that: (1) a negative legal presumption applies to Katz' Declaration; (2) there is an issue of title that precludes summary judgment; (3) Domain Protection has waived its right to recover on the Domain Names; and (4) Sea Wasp is immune from liability as registrar of the Domain Names. Only if after addressing each of these

arguments the Court finds that Domain Protection's Motion for Partial Summary Judgment may still be considered will the Court then continue to the merits of Domain Protection's Motion.

I.    Preliminary Issues

    a.    Declaration – Fiduciary Duty & Negative Legal Presumption

An affidavit or declaration should not be accepted as summary judgment evidence under Rule 56 if a court is satisfied that the affidavit or declaration was "submitted in bad faith." FED. R. CIV. P. 56(h); *see also Modica v. United States*, 518 F.2d 374, 376 (5th Cir. 1975) (affirming a finding of bad faith where a store owner's affidavit stated that he had no knowledge of violations of food stamp regulations, although he had admitted such knowledge in earlier administrative proceedings). Further, mere conclusory allegations are insufficient to support, or defeat, a motion for summary judgment. *See Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Likewise, unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994). With that being said, in reviewing all the evidence, including declarations, "a court must draw all reasonable inferences in favor of the nonmoving party, and avoid credibility determinations and weighing of the evidence." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 896 (5th Cir. 2002) (citing *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 149–50 (2000).

In the mix with the determination of whether a declaration was submitted in bad faith, in the present action, is the question of whether a negative legal presumption applies to a fiduciary in the declaration context. Sea Wasp has provided no legal authority for the proposition it espouses other than citing general fiduciary-duty caselaw.[2] The case that Sea Wasp cites for its argument that a negative legal presumption applies is *UTSA Apartments, L.L.C. v. UTSA Apartments 8,*

---

[2] The Court conducted its own search for relevant authorities applying a "negative legal presumption" to declarations and found no authority for Sea Wasp's contentions.

*L.L.C.*, 886 F.3d 473, 492 (5th Cir. 2018)).  *UTSA Apartments* stands for the basic tenet of law that "where a fiduciary engages in a transaction with a party to whom the fiduciary owes duties, a presumption of unfairness arises, and the burden is placed on the fiduciary to establish that the transaction was fair."  *Id.*  This proposition requires the fiduciary to prove that the transaction he or she engaged in was in good faith and that the transaction was fair, honest, and equitable; it does not stand for the proposition that a fiduciary automatically has a negative legal presumption apply against themselves when proffering declarations.  *Id.*  With that being said the Court understands Sea Wasp's argument—even if Sea Wasp cannot corroborate that argument with supporting authorities.  Sea Wasp is arguing that, because Katz is a fiduciary of Quantec, and because Sea Wasp believes Katz violated that fiduciary duty, anything that Katz does post-assignment of the Domain Names is tainted.  Sea Wasp accordingly believes that Katz must prove that each of her actions are fair, honest, and equitable at every turn—including when she proffers a declaration. That, however, is not the law.

As *Nobles v. Marcus* makes abundantly clear, "only the person whose primary legal right has been breached may seek redress for that injury."  *Nobles v. Marcus*, 533 S.W.2d 923, 927 (Tex. 1976));  *see also Capozzelli v. Allstate Insurance Company*, 2014 WL 786426, at *2 (E.D. Tex. Feb 25, 2014) (quoting *Nobles*, 533 S.W.2d at 927).  For example, *Nobles* states that a "suit to set aside a deed obtained by fraud can only be maintained by the defrauded party."  *Id.* (citing *Smith v. Carter*, 45 S.W.2d 398 (Tex. Civ. App.—Texarkana 1932, writ dism'd)).  Here, however, Sea Wasp is attempting to hold Katz to her fiduciary duty—assuming *arguendo*, for this section of the Court's opinion only, that Katz violated that fiduciary duty—by making her comply with basic concepts of agency law.  That is not Sea Wasp's role.  Indeed, when a party, such as Katz, assigns assets to another, such as Domain Protection, and that assignment is made without authority, that

assignment is voidable, not void. *See Reinagel v. Deutsche Bank Nat. Trust Co.*, 735 F.3d 220, 226 (5th Cir. 2013); *see also U.S. v. 422 Casks of Wine*, 1 Pet. 547, 550 (1828) ("If that conveyance was fraudulent as to creditors, it was not absolutely void, and only voidable by *them*.") (emphasis added). Further, the only party that may elect to void the assignment of assets is the principal. *Id.* A third party does not have a basis to challenge the validity of an assignment. *Id.* ("[T]he law is well settled that a stranger to a contract lacks standing to challenge [that] contract."). Accordingly, Sea Wasp is not entitled to hold Katz to any fiduciary duty that Sea Wasp believes she violated. Rather, Quantec, LLC, an entity who is not a party to the present action, is the only principal who may void Katz' assignment—assuming the assignment is even voidable. Until Quantec does so, which, again, is not an issue before the Court, the Court must presume that the assignment effectuated by Katz is proper. Thus, Sea Wasp's argument must be rejected. Sea Wasp is precluded from imposing upon Katz a negative presumption when Sea Wasp cannot adequately challenge that Katz even violated her fiduciary duty. To allow such a presumption to apply would be to permit Sea Wasp to punish Katz despite Sea Wasp not having the authority to satisfy the foundational requirement for such a presumption: the requirement that a fiduciary duty was actually violated. Sea Wasp's argument surrounding a negative legal presumption therefore fails.

Having considered, and rejected, Sea Wasp's argument that Katz' Declaration should be discarded for her purportedly violating her fiduciary duty to Quantec, the Court next considers whether there is any bad-faith in Katz' Declaration. The Court must also consider whether any statements offered by Katz are merely conclusory such that they may not be considered as evidence.

### i. Bad Faith

There are only two arguments offered by Sea Wasp that could support a bad-faith inference: (1) Sea Wasp's negative legal presumption argument; and (2) Sea Wasp's proffered declarations which purportedly contradict Katz' testimony. The negative legal presumption argument has been rejected. Accordingly, absent any further specific argument that Katz' Declaration is tainted by bad faith, the Court finds Sea Wasp's arguments lacking on this front. Merely pointing out that Katz is friends with her attorneys and that she has submitted prior declarations in this case is insufficient to establish bad faith.

Sea Wasp argues next that Katz' credibility has been irreparably wounded such that the Court must discredit her declaration entirely (Dkt. #168). In support of its second argument, Sea Wasp provides the Court with: (1) an excerpt from the May 31 deposition of Katz (Dkt. #179, Exhibit A); (2) a declaration by Jeffrey Rasansky (Dkt. #179, Exhibit B); and (3) a declaration by Christopher A. Payne (Dkt. #179, Exhibit C). In their declarations, Rasansky and Payne unequivocally deny any involvement with Schepps and Katz in creating the liquidation vehicle which came to be known as Domain Protection (Dkt. #179, Exhibit B; Dkt. #179, Exhibit C). Sea Wasp argues that these categorical denials require the Court to strike her "blatantly false" or "materially contested" declaration (Dkt. #179). Sea Wasp's conclusion is faulty in two regards. First, Katz' Declaration does not mention Rasansky or Payne whatsoever (Dkt. #123, Exhibit 18). Second, the Court cannot and will not engage in credibility determinations. *See Reeves,* 530 U.S. at 149–50; *Turner*, 476 F.3d at 343; *Sandstad*, 309 F.3d at 896. When coupled together, these two considerations compel the conclusion that Sea Wasp's declarations do not defeat Domain Protection's declaration. Because Katz does not address the facts that Sea Wasp seeks to poke holes in, Sea Wasp's Response can only be characterized as a general attack on Katz' credibility.

To be sure, Sea Wasp so much as says this when it states: "Their declarations sorely *challenge Katz's credibility*" (Dkt. #179) (emphasis added), followed by the arguments that "no summary judgment may safely be granted based on her *wounded credibility*" (Dkt. #179) (emphasis added). The Court will not entertain such an argument.

Even if these declarations were not simply offered as attacks on Katz' credibility, the Court would still be unpersuaded that Katz' Declaration has been fatally wounded. The line of testimony that Sea Wasp is attempting to poke a hole in—namely, which creditors, if any, threatened Quantec, LLC with bankruptcy—is only an ancillary topic; a topic that is even more ancillary given the Court's conclusion in Part 1(b), *infra*. Moreover, Sea Wasp has not pointed to any specific portion of Katz' Declaration that should be stricken due to Katz' "self-interest" or "wounded credibility" (Dkt. #179). *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Because Sea Wasp provides no specific argument as to why certain portions of the Declaration should be stricken for bad faith, the Court finds that Sea Wasp has not met its burden. Sea Wasp's bad faith/credibility arguments accordingly fail.

ii. Conclusory Language

Second, Sea Wasp states generally that Katz' Declaration is predicated upon "language not tied to demonstrable facts" and thus the Court should "disregard conclusory ambiguous language which [is] not clearly a fact drawn from demonstrable personal knowledge" (Dkt. #168). Sea Wasp argues that Katz' Declaration is conclusory by providing the Court with a conclusory argument. Sea Wasp's argument is not enough to be considered a fully briefed argument that would be proper for the Court to include in its analysis. *See United States v. Volksen*, 766 F.2d 190, 193 (5th Cir. 1985); *Ragland v. Dallas Cty. Cmty. Coll. Dist.*, 2017 WL 1196863, at *5 (N.D. Tex. Mar. 31, 2017); *Kostic v. Tex. A & M Univ. at Commerce*, 11 F. Supp. 3d 699, 735 (N.D.

Tex. 2014) (citing *Petrie v. City of Grapevine*, 904 F. Supp. 2d 569, 585 (N.D. Tex. 2012)). With that being said, the Court has an evidentiary gatekeeping duty and will accordingly review Katz' Declaration *sua sponte*.

The Court is of the opinion that Paragraphs 6, 15, 37, 47, and 48 of Katz' Declaration (Dkt. #123, Exhibit 18) should be stricken in part as either conclusory or lacking personal knowledge. *See Forsyth*, 19 F.3d at 1533. Paragraph 6 describes the suits brought by Baron against Katz as vexatious (Dkt. #123, Exhibit 18). To the extent that ¶ 6 relies upon characterizing former lawsuits against Katz, ¶ 6 is stricken. *See Forsyth*, 19 F.3d at 1533. Paragraph 15 describes Sea Wasp, LLC as a shell entity that was created in mid-2017 (Dkt. #123, Exhibit 18). To the extent that ¶ 15 provides a legal conclusion as to Sea Wasp, LLC's nature—i.e., whether it is a shell entity—¶ 15 is stricken. *See Forsyth*, 19 F.3d at 1533. Paragraph 37 states:

> 37. Sea Wasp was informed about Domain Protection's pending sales contracts and acted, expressly, to stop all sales. Sea Wasp clearly knew the results of its actions and that the interference was substantially likely to occur as a result of its conduct and willfully intended to redirect the advertising revenue and interfere with sales of domain names. Sea Wasp also engaged in fraud, falsely representing to me and counsel for Domain Protection that Sea Wasp did not change the nameserver records, and that I still had control of the DNS (i.e., nameserver) records, even after Sea Wasp altered the records and is interfering with my control.

(Dkt. #123, Exhibit 18). Paragraph 37 proclaims that Sea Wasp acted willfully and that it engaged in fraud. Those claims, which are conclusory and legal in nature, are hereby stricken. *See Forsyth*, 19 F.3d at 1533. Paragraphs 47 and 48 provide:

> 47. Since sales prices have always substantially exceeded appraised value, the full amount of loss is unknown and irreparable, as there is no way to ascertain what the sales price would have been if Sea Wasp had not prevented the sale of the names. Still, within sixty days, at appraised value, the loss of non-renewing domain names caused by Sea Wasp will exceed a million dollars. Even those partial damages, based on appraised value, in reasonable likelihood cannot be recovered because Sea Wasp is a shell entity with no substantial attachable assets. No real property owned by Sea Wasp could be located, nor could other attachable assets be identified. The only assets counsel for Sea Wasp could point to are computer servers, which, based upon the information available, appears to have a liquidation value of approximately $20,000.00.

48. Sea Wasp does not appear to independently provide any service or management. Rather, when asked who was providing support for Sea Wasp, I was told by the Sea Wasp 'support' that Sea Wasp uses another entity, "DirectNic", to provide its customer service and programming functions. Sea Wasp does not even appear to have an operations center and lists its address as "3500 N. Causeway Blvd, Suite 160 Metairie, LA 70002", which is the same address listed for LegisLink, LLC, DNC Holdings, Inc., CCS Computer Consulting and Support, Be Fit Financially, LLC, Women's Financial Solutions Network, domainapps, AmMax Publications, Dotology, and dozens of other entities, including Gulf States Remediation Group, LLC, Landeche Insurance Agency, etc.

To the extent that ¶¶ 47–48 describe Sea Wasp, LLC and imply that it is a shell entity simply by its "appearance" without any express personal knowledge, ¶¶ 47–48 are hereby stricken. *See Forsyth*, 19 F.3d at 1533. The remainder of Katz' Declaration is permissible summary judgment evidence. *See* FED. R. CIV. P. 56; *Celotex*, 477 U.S. at 323. Having determined that Katz' Declaration is proper summary judgment evidence, the Court turns to Sea Wasp's title argument.

### b. Title to the Domain Names

Sea Wasp next argues that Domain Protection's Motion for Partial Summary Judgment is precluded by Domain Protection's inability to establish clear title (Dkt. #168). Absent clear title, Sea Wasp continues, Domain Protection does not have standing to pursue its claims against Sea Wasp (Dkt. #168). Sea Wasp notes that there has been (and continues to be) litigation over the ownership of the Domain Names that it believes Domain Protection should lose—its professed neutrality in the Underlying Dispute apparently notwithstanding. Sea Wasp argues that Katz was merely holding the Domain Names in some nominal capacity for the LLCs and lacked authority to transfer them. The Court disagrees. The Northern District of Texas makes clear that, while disputes over their control were pending, Katz had the "authority to manage the LLCs and their assets" (Dkt. #54, Exhibit 14 at p. 5)—not that Katz was holding the Domain Names nominally. It follows that Katz could dispose of the Domain Names. After all, entities are necessarily run by individuals serving as their agents. *See Fields v. State*, No. 11-07-00095-CR, 2008 WL 4356367, at *1 (Tex. App.—Eastland 2008, *no pet.*) (citing *Johnson v. State*, 606 S.W.2d 894, 895 (Tex.

Crim. App. 1980); *Manning v. State*, 68 S.W.3d 697, 698 (Tex. App.—Corpus Christi 2000, pet. ref'd) ("A person acting on behalf of a corporation, with managerial authority and responsibility over its goods, is the effective owner."). And the undisputed evidence reflects that Katz transferred the Domain Names in her capacity as an agent for the LLCs' here. In a sworn statement, Katz explains that she transferred the names to pay off *the LLCs'* creditors.

Additionally, despite all of the litigation concerning the Domain Names, Sea Wasp has not identified a single order finding that the Northern District was wrong to return the Domain Names to Katz or that Katz was wrong to transfer the Domain Names to Domain Protection. And it is surely not the Court's place to decide the outcome of this litigation. *See United States v. Tex. Tech. Univ.*, 171 F.3d 279, 286 (5th Cir. 1999) (discussing "the well-established principle that the federal courts may not issue advisory opinions"). Until a court finds otherwise, the Court must presume that the Northern District properly returned the names to Katz, *see Cocke, for Use of Commercial Bank of Commerce v. Halsey*, 41 U.S. 71, 87 (1842) (explaining that orders are binding until they are overturned), and that Domain Protection's possession is lawful, *see* CLIFFORD S. FISHMAN & ANNE T.MCKENNA, 2 JONES ON EVIDENCE § 10:18 (7th ed. 2019) (citing, among other cases, *Reiter v. Coastal States Gas Producing Co.*, 382 S.W.2d 243, 252 (Tex. 1964)) ("A person in possession of property is presumed to lawfully possess it.").

If the following was insufficient to establish that the question of title is not before the Court, *Reinagel* seals Sea Wasp's fate. As previously stated, and as argued by Domain Protection in its Reply (Dkt. #177), when a party, such as Katz, assigns assets to another and that assignment is *potentially* made without authority, that assignment is voidable, not void. *See Reinagel*, 735 F.3d at 226; *see also 422 Casks of Wine*, 1 Pet. at 550 ("If that conveyance was fraudulent as to creditors, it was not absolutely void, and only voidable by them."). The only party that may elect to void the

assignment of assets is the principal. *Id.* A third party does not have a basis to challenge the validity of an assignment. *Id.* ("[T]he law is well settled that a stranger to a contract lacks standing to challenge [that] contract."). Thus, Sea Wasp is not the proper party to challenge whether Domain Protection has clear title to the Domain Names. Such arguments accordingly do not defeat Domain Protection's Motion for Partial Summary Judgment.

      c.   Waiver

Sea Wasp's third argument is that Domain Protection has waived any right to recover due to its conduct during discovery and its acquiescence to the executive lock which had formerly been placed on the Domain Names by Fabulous (Dkt. #168). First, Sea Wasp's argues that Domain Protection and Schepps have waived any right to recover due to their "violation of the Court's Scheduling Order, requirement that separate motions to compel be filed, misrepresentations to the Court, and failures to comply with Local Rule AT-3(C) and Texas Rules of Professional Conduct . . . ." (Dkt. #168). Sea Wasp, in support of this argument, cites its Motion for Sanctions and two Motions to Compel (Dkt. #168). The Court has already ruled on those Motions. In so ruling, the Court sanctioned Schepps for his failure to disclose his financial interest, ordered Katz' to appear at her personal and 30(b)(6) depositions, and otherwise denied the requested relief (Dkt. #263; Dkt. #295). The Court does not agree that any such misconduct warrants waiver of Domain Protection's right to potentially secure relief nor merits dismissal. Rather, as stated in its prior opinions, the Court's Orders in Dkt. #263 and Dkt. #295 have adequately addressed any such violations. Nowhere in its opinions did the Court rule that Domain Protection waived its

entitlement to seek legal relief (Dkt. #263; Dkt. #295). Thus, no waiver, under Sea Wasp's first argument, has occurred.

Sea Wasp next argues that Domain Protection waived its right to recover due to its acquiescence to the executive lock which had formerly been placed on the Domain Names by Fabulous (Dkt. #168). This argument also fails. As Domain Protection retorts, "[i]t is irrefutable that when Sea Wasp physically took control over registrar functions for Domain Protection's domain names, the domain names were not locked" (Dkt. #177). The Court has recognized this when it outlined the agreed upon facts for its opinion ordering a preliminary injunction:

> The Parties agree that: (1) the Domain Names were subject to an executive lock while the suits in Texas and Australia were pending; (2) the executive lock was removed for a (short) period after these suits were dismissed, which allowed Domain Protection to make certain changes to the Domain Names' nameserver records; (3) Sea Wasp reversed the changes and placed the lock back on after the Bankruptcy Court action was initiated; and (4) Domain Protection responded by filing this suit and motion.

(Dkt. #192). Simply because Domain Protection had acquiesced to Fabulous' placement of an executive lock does not permit Sea Wasp to then restore the executive lock and claim innocence. As Katz testified, and Sea Wasp failed to rebut, Sea Wasp did not have the consent or authorization of Domain Protection to place an executive lock on Domain Protection's Domain Names. Consequently, Sea Wasp cannot claim that prior consent equates to current consent.[3] Sea Wasp's arguments surrounding waiver accordingly fail.

### d. Immunity Pursuant to ICANN Inter-Registrar Transfer Policy § 3.7

Lastly, Sea Wasp argues that it has effective immunity as a stakeholder because, as a registrar, it was faced with competing claims for the Domain Names and also had evidence of fraud.[4] Sea Wasp holds immunity, according to Sea Wasp, because, pursuant to § 3.7 of the Inter-

---

[3] The record reflects that Domain Protection requested that Sea Wasp remove the lock and that Sea Wasp refused.

[4] Sea Wasp also argues that Domain Protection cannot file this suit because Domain Protection "violated Paragraph 6 of the UDRP by suing Sea Wasp . . . ." (Dkt. #168). The Court disagrees. Domain Protection is suing Sea Wasp for its failure to comply with the UDRP—not joining Sea Wasp in a suit against Baron or others who claim ownership

Registrar Transfer Policy, Sea Wasp was authorized to refuse to release the executive lock on the Domain Names so it could maintain the status quo (Dkt. #168). The Court is unconvinced.

Under ICANN's Inter-Registrar Transfer Policy, the "Registrar of Record may deny a transfer request" when there is a "[r]easonable dispute over the *identity* of the Registered Name Holder or Administrative Contact" (Dkt. #123, Exhibit 53) (emphasis in original). According to Sea Wasp, this Policy allows it to place an executive lock on the Domain Names—presumably because such a lock prevents Domain Protection from transferring the Domain Names to another registrar.[5] But a dispute over whether Domain Protection is the *rightful owner* of the Domain Names does not constitute a dispute over "the *identity* of the Registered Name Holder" (Dkt. #123, Exhibit 53) (emphasis in original). This is evident from ICANN's instruction that, in such a dispute, the registrar "may request ID documents." *See* ICANN, ABOUT ID REQUIREMENTS, https://www.icann.org/resources/pages/id-2013-05-03-en (last visited November 24, 2019). This is not a dispute over "the identity" of the Registered Name holder as a result.

Sea Wasp's interpretation of the Inter-Registrar Transfer Policy is too broad, regardless. ICANN's Inter-Registrar Transfer Policy allows the Registrar, Sea Wasp, to prevent Domain Protection from transferring the Domain Names to another Registrar when applicable. It does not allow Sea Wasp to place an executive lock on the Domain Names, which prevents Domain Protection from making *any changes* to the registration information associated with the Domain Names. After all, there are other, less restrictive ways to prevent domain names from being transferred from one registrar to another other than an executive lock—such as by denying an

_____

over the Domain Names. Additionally, the only apparent remedy the UDRP provides for the decision to involve a registrar in a dispute is to allow the registrar to assert any appropriate defenses it has to the claims in question. *See* ICANN UDRP ¶ 6.

[5] Sea Wasp does not explain why a policy on "inter-registrar transfer" allows it to place an executive lock on the Domain Names.

inter-registrar transfer or imposing a "registrar lock" (Dkt. #60 at p. 16). As Sea Wasp explains, a registrar lock "merely prevents domain names from being transferred to another registrar" without an executive lock's other restrictions (Dkt. #60 at p. 16). In short, if ICANN intended to require registrars to place an executive lock on a domain name while an ownership dispute was ongoing, it would have said so. *See, e.g., GoForItEntm't, LLC v. DigiMedia.com L.P.*, 750 F.Supp.2d 712, 738 n.20 (N.D. Tex. 2010) (discussing a provision allowing a registrar to, "at its sole discretion, suspend [the customer's] ability to use [its]domain name or to make modifications to [its] registration records" once the registrar "is notified that a complaint has been filed with a judicial or administrative body regarding [customer's] domain name"). ICANN does just that in other contexts. ICANN provides that a lock should be placed on a domain name in the course of certain disputes—such as when a claim is filed with ICANN's Uniform Rapid Suspension System (the URS").[6] *See, e.g.*, ICANN, URS PROCEDURE at p. 7, *available at* https://newgtlds.icann.org/en/applicants/urs (last visited November 24, 2019) (explaining that, once a URS complaint is filed, the registrar is to lock the domain names). ICANN "knew how to state clearly" when a lock should be imposed and chose not to require one every time a dispute over a domain name arises. *See El Paso Field Servs., L.P. v. MasTec N. Am.,Inc.*, 389 S.W.3d 802, 811 (Tex. 2012) ("[T]hose other contract provisions support our reading of the contract because they show that the parties knew how to state clearly when some risks were not to be assumed by MasTec.").

The Court notes that Sea Wasp has now added the argument that it is immune due to § 3.7.1 which permits the denial of a transfer request—not the placement of an executive lock—when

---

[6] The URS is "a lower-cost, faster path to relief [that ICANN makes available] for . . . clear-cut cases of infringement caused by domain name registrations." ICANN, ABOUT UNIFORM RAPID SUSPENSION SYSTEM (URS), https://www.icann.org/resources/pages/urs-2013-10-31-en (last visited November 24, 2019).

there is evidence of fraud. This argument, notably, was not raised in Defendant Sea Wasp, LLC's Response in Opposition to Motion for Preliminary Injunction (Dkt. #60). Notwithstanding the novelty of this argument, the Court finds that this argument also fails. Sea Wasp includes one sentence in its Response regarding fraud, which states: "Here, the evidence of fraud in Domain Protection's acquisition of the domain names is overwhelming, and the ownership/control dispute is clear and undeniable" (Dkt. #168). None of this "overwhelming" evidence was provided to the Court.[7] Any attempt to argue that Sea Wasp is immune due to a finding of fraud is inadequately briefed and thus waived as a result. *See Audler v. CBC Innovis Inc.*, 519 F.3d 239, 255 (5th Cir. 2008) (quoting *Castro v. McCord*, 259 F. App'x 664, 665 (5th Cir. 2007)) ("A party 'waives an issue if he fails to *adequately* brief it.'") (emphasis added).[8] Sea Wasp's immunity argument is accordingly denied.

Having resolved the preliminary defenses to summary judgment, the Court now turns to the merits of Domain Protection's Motion for Partial Summary Judgment.

II.    The Internet Corporation for Assigned Names and Numbers Uniform Domain Name
       Dispute Resolution Policy

Before the Court can address the issue presented by Domain Protection, it must determine the evidence it will consider. The Court will then address the merits of Domain Protection's Motion.

a.    Evidence to be Considered

Rule 56(c) provides that:

(c) Procedures.

---

[7] When raising this argument, Sea Wasp fails to cite to any evidence in the (extensive) record reflecting that it, in fact, had evidence of fraud pursuant to § 3.7. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

[8] Even if Sea Wasp's fraud argument had merit and was adequately briefed, a finding of fraud would only permit the denial of a transfer request, not the placement of an executive lock on the Domain Names.

(1) *Supporting Factual Positions*. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; . . .

(4) *Affidavits or Declarations*. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED. R. CIV. P. 56(c)(1)(a), (c)(4). Rule 56(e) goes on to provide that:

(e) Failing to Properly Support or Address a Fact. If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

FED. R. CIV. P. 56(e). With those rules in mind, the Court is presented with the following evidence.

Domain Protection submits the following evidence in support of its Motion for Partial Summary Judgment:

Dkt. #5: Excerpts

Dkt. #14: Excerpts

Dkt. #41: Excerpts

Dkt. #105 Excerpts

Exhibit 1 (Dkt. #123): The ICANN UDRP

Exhibit 7 (Dkt. #123): Sea Wasp Letter Your Domain Names in Your Control

Exhibit 8 (Dkt. #123): Sea Wasp March 28, 2018 Fraudulent Confirmation

Exhibit 12 (Dkt. #123): June 11, 2018 Vinteralla Letter DNS Change was a Programming Issue

Exhibit 15 (Dkt. #123): Sea Wasp Letter Denying Modifying Nameserver Records

Exhibit 28 (Dkt. #123): March 28, 2019 Letter Confirming No Agreement

Exhibit 42 (Dkt. #123): Receiver Directive to Fabulous to Turn Over Asset to Katz

Exhibit 44 (Dkt. #123): February 28, 2014 Order to Turn Over Assets to Katz (Page 9)

Exhibit 47 (Dkt. #123): March 24, 2015 Order

Exhibit 52 (Dkt. #123): VeriSign Registrar Agreement Excerpt

Exhibit 53 (Dkt. #123): ICANN Inter-Registrar Transfer Policy

Exhibit 57 (Dkt. #123): Fabulous Domains Released Email

Exhibit 115 (Dkt. #123): September 12, 2018 Stipulation by Sea Wasp – No Lock in January 2018

Exhibit 151 (Dkt. #123): Katz' Declaration

Exhibit A (Dkt. #177): Domain Protection Certificate of Existence

Sea Wasp submits the following evidence in opposition to Domain Protection's Motion:

Exhibit A (Dkt. #168): Depositions of Domain Protection Corporate Representative and Lisa Katz

Exhibit B (Dkt. #168): Court Denial of Domain Protection's Motion to Quash Katz' Subpoena

Exhibit C (Dkt. #168): Videotaped Oral Deposition of Lisa Katz, 30(b)(6) Representative of Domain Protection, LLC

Exhibit D (Dkt. #168): Katz Deposition – Schepps Objections

Exhibit E (Dkt. #168): Business Organization Inquiry

Exhibit F (Dkt. #168): Order in 3:09-CV-0988-L

Exhibit G (Dkt. #168): Certificate of Nonappearance for the Videotaped Oral Deposition of Elissa (Lisa) Katz

Exhibit A (Dkt. #179): Videotaped Oral Deposition of Lisa Katz, 30(b)(6) Representative of Domain Protection, LLC

Exhibit A (Dkt. #179): Declaration of Jeffrey Rasansky

Exhibit A (Dkt. #179): Declaration of Christopher A. Payne

Sea Wasp objects to "Exhibit 151 (Dkt. #123): Katz' Declaration." The Court has already resolved the issues surrounding Katz' Declaration as discussed in Part I(a), *supra*. Accordingly, the discussion above is incorporated herein and limits the evidence in Katz' Declaration as

previously outlined. Sea Wasp does not object to any of the remaining evidence proffered by Domain Protection. Domain Protection does not object to any of the evidence submitted by Sea Wasp. Sea Wasp has agreed, admitted to, or failed to contest the foregoing facts. *See Anderson*, 477 U.S. at 248–49; *Byers*, 209 F.3d at 424. Indeed, Sea Wasp has spent its briefing offering the arguments which the Court has already addressed in Part I, *supra*. Accordingly, the relevant, undisputed facts can be adequately summarized as follows. Domain Protection is the registrar of tens of thousands of Domain Names. Domain Protection came into possession of those Domain Names following Lisa Katz' assignment of the Domain Names from Quantec, LLC to Domain Protection, LLC. Those Domain Names were subject to an executive lock which was put in place by Fabulous while suits in Texas and Australia were pending. Following the dismissal of those suits, the executive lock was removed by Fabulous. Domain Protection then made certain changes to the Domain Names' nameserver records. Sea Wasp replaced Fabulous as registrar of the Domain Names. Sea Wasp then placed another executive lock on the Domain Names without Domain Protection's consent. Domain Protection then filed the immediate action. Finding that there is no genuine dispute of material fact, the Court proceeds to the issue presented to it. *See Anderson*, 477 U.S. at 248–49; *Fontenot*, 780 F.2d at 1194. Namely, whether a domain name registrar such as Sea Wasp is authorized under the ICANN rules to become involved in purported domain name ownership disputes and to alter a registrant's domain name nameserver records without the registrant's consent (or the order of a court or administrative panel) (Dkt. #123).

    b. The Merits

The Internet Corporation for Assigned Names and Numbers ("ICANN") is a "nonprofit corporation that governs the Internet." *Lockheed Martin Corp. v. Network Solutions, Inc.*, 141 F. Supp. 2d 648, 651 (N.D. Tex. 2001). ICANN was established in 1998 and is "officially recognized

by the U.S. Department of Commerce as the global, non-profit consensus organization designed to carry on administration of the Internet name and address system." *Id.* In October of 1999, ICANN adopted the Uniform Domain Name Dispute Resolution Policy ("UDRP"). *See* Internet Corp. for Assigned Names and Numbers, UDRP (Oct. 24, 1999), https://www.icann.org/resources/pages/policy-2012-02-25-en [hereinafter "ICANN UDRP"]. The UDRP governs relations between registrars and domain name holders, "provides for resolution of domain disputes . . ." and must be adhered to by all who register a domain name in the ".com," ".net," and ".org" top-level domains. *Network Solutions*, 141 F. Supp. 2d at 651; *see also Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 737 F.3d 546, 548 n.1 (9th Cir. 2013) ("Registrars are required to comply with the UDRP . . . ."). Indeed, as the Court has already determined, § 3.8 of the ICANN Regisrar Accreditation Agreement requires all registrars to incorporate ICANN's UDRP into their registration agreements with domain-name registrants (Dkt. #192) (citing Dkt. #54, Exhibit 8 at p. 12). This means that the UDRP governs both the registrar's and the registrant's rights "in connection with a dispute between [domain-name registrants] and any party other than . . . the registrar . . . over the resolution and use of an Internet domain name registered by [the registrant]" (Dkt. #123, Exhibit 1). Pursuant to the preamble of ICANN's UDRP, the policy "uses 'we' and 'our' to refer to the registrar and it uses 'you' and 'your' to refer to the domain-name holder." *See* ICANN UDRP Preamble. Following the preamble, the UDRP provides a number of Paragraphs which govern everything from the purpose of the UDRP, to dispute resolution, to policy modification. *See* ICANN UDRP. Those Paragraphs are as follows.

Under ¶ 3 of the UDRP, a registrar is permitted to "cancel, transfer, or otherwise make changes to domain name registrations under the following circumstances:" (a) written

authorization from the registrant; (b) receipt of a court order; or (c) receipt of an order from an administrative panel. ICANN UDRP ¶ 3. A registrar may also "cancel, transfer or otherwise makes changes to a domain name registration in accordance with the terms of your Registration Agreement or other legal requirements." *Id.* Paragraph 4 governs Mandatory Administrative Proceedings. *See* ICANN UDRP ¶ 4. A mandatory administrative proceeding is only required when:

> (1) your domain name is identical or confusingly similar to a trademark or service mark in which the complainant has rights; and
> (2) you have no rights or legitimate interests in respect to the domain name; and
> (3) your domain name has been registered and is being used in bad faith.

*Id.* As evidenced by the text of ¶ 4, ¶ 4 only governs trademark disputes. *Id.* Paragraph 6 then states that:

> We will not participate in any way in any dispute between you and any party other than us regarding the registration and use of your domain name. You shall not name us as a party or otherwise include us in any such proceeding. In the event that we are named as a party in any such proceeding, we reserve the right to raise any and all defenses deemed appropriate, and to take any other action necessary to defend ourselves.

*See* ICANN UDRP ¶ 6. Following ¶ 6, ¶ 7 states that: "We will not cancel, transfer, activate, deactivate, or otherwise change the status of any domain name registration under this Policy except as provided in Paragraph 3 above." ICANN UDRP ¶ 7. Again, ¶ 3 only permits cancellation, transfer, activation, deactivation, or any other change upon the consent of the registrant or receipt of a court or administrative order. *See* ICANN UDRP ¶ 3. Finally, ¶ 8 governs transfers during a dispute. Paragraph 8(a) prohibits transfers to a new holder if: (1) there is a pending administrative proceeding under ¶ 4; or (2) there is a pending court or administrative proceeding and the new holder has not agreed, in writing, to "be bound by the decision of the court or arbitrator." ICANN UDRP ¶ 8(a). Paragraph 8(b) follows by stating that a domain-name holder may not transfer its domain names to another registrar when a ¶ 4 administrative proceeding is pending unless the

"domain name you have registered with us shall continue to be subject to the proceedings commenced against you in accordance with the terms of this Policy." ICANN UDRP ¶ 8(b).[9]

The text of ICANNS's UDRP is clear. ICANN rules specifically prohibit registrars from: (1) becoming involved in domain name ownership disputes; and (2) altering domain name nameserver records without the registrant's consent. *See* ICANN UDRP ¶ 7; *see also Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 897 F. Supp. 2d 856, 861 (N.D. Cal. 2012) ("[T]he UDRP specifically prohibits registrars from becoming involved in disputes over domain name ownership."), *aff'd*, 737 F.3d 546, 548 n.1 (9th Cir. 2013). A registrar is *only* authorized to interfere with a registrant's control over their domain name records when the registrant consents, in writing, or there is a court or administrative panel order directing the registrar to do so. *See* ICANN UDRP ¶ 3. Here, the record is clear. *See Anderson*, 477 U.S. at 248–49. Sea Wasp did not obtain a court order or administrative panel order. Sea Wasp also did not obtain consent from Domain Protection to interfere with Domain Protection's control of its Domain Names.[10] Despite these facts, and the clear text of UDRP ¶¶ 3, 7, [11] Sea Wasp inserted itself, placed an executive lock on Domain Protection's Domain Names without Domain Protection's consent,[12] and thus acted outside the scope of its legal authority under ICANN'S UDRP.

Tellingly, Sea Wasp does not dispute the clear meaning of the UDRP text. *See In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d at 440. Rather, Sea Wasp argues that ICANN Inter-

---

[9] Paragraph 8(b) also prohibits transfer for a "period of fifteen (15) business days (as observed in the location of our principal place of business) after such proceeding is concluded" (Dkt. #123, Exhibit 1).

[10] Sea Wasp judicially admitted in Defendant Sea Wasp, LLC's Response Opposing Motion for Issuance of Temporary Restraining Order and Temporary Injunction (Dkt. #14) that Domain Protection is the registrant.

[11] Paragraph 4, as has been previously stated, only governs trademark disputes. *See* ICANN UDRP ¶ 4. Paragraph 8 only governs administrative proceedings—both trademark and non-trademark. *See* ICANN UDRP ¶ 8. Accordingly, while these Paragraphs are often the focus of court opinions, those Paragraphs are not in play here.

[12] *See* Dkt. #123, Exhibit 151 (stating that "without notice to, or consent from Domain Protection, Sea Wasp seized control over Domain Protection's domain names"); *see also* Dkt. 14 (stating that "[d]ue to its knowledge of the present ownership dispute, Sea Wasp is maintaining an "executive lock" on the names, which prevents transfer and sale of the names by the registrant . . . .").

Registrar Transfer Policy § 3.7 authorizes registrars to alter domain name nameserver records without the registrant's consent. As the Court has already ruled in Part I(d), *supra*, however, the ICANN Inter-Registrar Transfer Policy § 3.7 does not permit such interference. *See* Dkt. #192 (discussing how ICANN Inter-Registrar Transfer Policy § 3.7 does not insulate Sea Wasp from its conduct). To be sure, the text of § 3.7 only permits a registrar to "deny a transfer request" in specific instances. It does not, as Sea Wasp maintains, permit a registrar to make changes to a domain names nameserver records, place an executive lock on domain names, or otherwise become involved in domain name ownership disputes. Indeed, ICANN "knew how to state clearly" when a lock should be imposed and chose not to require one every time a dispute over a domain name arises. *See El Paso Field Servs.*, 389 S.W.3d at 811. Thus, at most, Sea Wasp would have only been permitted to deny a transfer of the Domain Names—assuming § 3.7 was properly in play due to an *identity* dispute—not place an executive lock on them. Yet even then, the record is clear: there is no requested inter-registrar transfer in this case and no dispute over identity.[13] Further, the Court has found that Sea Wasp's fraud argument, pursuant to § 3.7.1 of the ICANN Inter-Registrar Transfer Policy, has been waived. Consequently, the Court finds that Sea Wasp was not authorized under the ICANN rules to become involved in purported domain name ownership disputes and to alter Domain Protection's Domain Name nameserver records without Domain Protection's consent.

Domain Protection argues that an affirmative answer to the question presented establishes "Sea Wasp's liability for the claims of Theft, Conversion, violation of the Stored Communications Act, and Tortious Interference" (Dkt. #123). Sea Wasp did not provide the Court with briefing to

---

[13] A dispute over whether Domain Protection is the *rightful owner* of the Domain Names does not constitute a dispute over "the identity of the Registered Name Holder." *See* ICANN, ABOUT ID REQUIREMENTS, https://www.icann.org/resources/pages/id-2013-05-03-en (last visited November 24, 2019); *see also* Dkt. #14, *supra* note 9.

the contrary. Further, Sea Wasp did not dispute the facts that underlie this action.[14] With that being said, Sea Wasp cannot be deemed liable under four causes of action merely because of its failure to brief. Rather, Domain Protection must establish that it is entitled to judgment as a matter of law. *See* FED. R. CIV. PRO. 56(a). The Court accordingly proceeds to determining whether Domain Protection has carried its burden of proof, and is thus entitled to judgment as a matter of law, with respect to the Texas Theft Liability Act, Tortious Interference, Conversion, and the Stored Communications Act.

## III.     Liability

Having found that Sea Wasp was not authorized under the ICANN rules to become involved in purported domain name ownership disputes and to alter Domain Protection's Domain Name nameserver records without Domain Protection's consent, the Court must now determine whether Sea Wasp is indeed liable for the four causes of action that Domain Protection asserts in its Motion. The Court considers each cause of action independently.

### a.   Texas Theft Liability Act

"Under the Texas Theft Liability Act ("TTLA"), a person who commits theft is liable for damages resulting from the theft. TEX. CIV. PRAC. & REM. CODE § 134.002(3). 'The TTLA provides victims of a theft, as defined in various sections of the Texas Penal Code, with a civil action to recover damages, fees, and costs from the thief.'" *Beardmore v. Jacobsen*, 131 F. Supp. 3d 656, 669 (S.D. Tex. 2015) (citing *In re Powers v. Caremark Inc.*, 261 Fed. Appx. 719, 721 (5th Cir. 2008)). A plaintiff establishes a TTLA claim by showing that:

(1) the plaintiff had a possessory right to property or was the provider of services;[15]

---

[14] While Sea Wasp begins its Response with the proclamation that "material underling facts are disputed," Sea Wasp provides the Court with no summary judgment evidence that compels its unsupported assertion (Dkt. #168).

[15] Texas courts have long held that a party may bring a TTLA claim against another based merely on its *possession* over the property in question. After all, Texas theft laws are meant to "protect all ownership interests in property"— and not simply full ownership. *Freeman v. State*, 707 S.W.2d 597, 603 (Tex. App.—San Antonio 1986) (en banc)

(2) the defendant unlawfully appropriated property or unlawfully obtained services in violation of certain sections of the Penal Code;[16] and

(3) the plaintiff sustained damages as a result of the theft.

*In re Minardi*, 536 B.R. 171, 186 (Bankr. E.D. Tex. 2015) (citing *Wellogix, Inc. v. Accenture, LLP*, 788 F. Supp. 2d 523, 542 (S.D. Tex. 2011). A plaintiff must also establish that the defendant intended to unlawfully appropriate the property or obtain the services in question. *See Winkley v. State*, 123 S.W.3d 707, 713 (Tex. App.—Austin 2003, no pet.). "Even in cases where there exists no evidence directly indicating an intent to steal property, it has been held that such intent may be inferred from the words, actions, or conduct of the actor." *Id.* (citing *McGee v. State*, 774 S.W.2d 229, 234 (Tex. Crim. App. 1989); *Banks v. State*, 471 S.W.2d 811, 812 (Tex. Crim. App. 1971)).

Here, Domain Protection plainly has some proprietary interest in the Domain Names. After all, Domain Protection is the registrant of the very Domain Names in dispute—a fact which Sea Wasp has judicially admitted. *See* Dkt. #14; *see also* Dkt. #105 (stating that "Sea Wasp agrees that Domain Protection would be the "factual" possessor of the domain names because Domain Protection is listed in the WHOIS registration database as the registrant of the domain names."). And, as explained, a different court had previously appointed a receiver over Baron's assets and those belonging to LLCs with ties to him. When it came time to unwind the receivership, the court directed the LLCs' assets to be returned to Katz as the Local Operations Manager for the LLCs. Katz then assigned the Domain Names to Domain Protection. This makes Domain Protection the

---

("The issue of 'ownership' goes to the scope of the property interest protected by the law and is intended to protect all ownership interests in property from criminal behavior. When there are equal competing possessory interests in property allegedly stolen, we believe that the key to answering the question of which person has the greater right to possession of the property is who, *at the time of the commission of the offense,* had the greater right to possession of the property.") (emphasis in original). Domain Protection thus needs to show only that it "owns" *some* proprietary interest in the Domain Names and that Sea Wasp is appropriating that interest. *See Manning v. State*, 68 S.W.3d 697, 698 (Tex. Crim. App.—Corpus Christi 2000, *pet. ref'd*) (citing *Easton v. State*, 533 S.W.2d 33, 35 (Tex. Crim. App. 1976)) ("The State can prove ownership in three ways: (1) by showing title, (2) by proving possession, or (3) by showing that the alleged owner has a greater right to possession than the defendant.").

[16] "Appropriation of property is unlawful if it is without the owner's effective consent." 4 Tex. Penal Code § 31.03(b)(1) (Vernon Supp. 2014).

party in possession of the Domain Names.  *See Dkt.* #105 ("Absent the executive lock, Sea Wasp agrees that Domain Protection would be the "factual" possessor of the domain names because Domain Protection is listed in the WHOIS registration database as the registrant of the domain names.").  Further, Domain Protection has the greater right to control the Domain Names given ¶ 3 of ICANN's UDRP which requires Sea Wasp to receive consent from Domain Protection prior to making any changes to the Domain Names.  ICANN UDRP ¶ 3.

Next, it is evident that Sea Wasp unlawfully appropriated the Domain Names.  In Texas, a party commits "theft" by "unlawfully appropriat[ing] property with intent to deprive the owner of property."  TEX. PENAL CODE § 31.05.  A party unlawfully appropriates property by transferring, acquiring, or exercising control over the property "without the owner's effective consent." *Id.* §§ 31.01, 31.03.  Sea Wasp cannot credibly argue that it placed the executive lock back on the Domain Names with Domain Protection's consent.  Domain Protection is the registered name holder in this case and has asked Sea Wasp, by email, to unlock the Domain Names so that it may transfer the Domain Names, make other changes to their registration information, or both.  The UDRP requires Sea Wasp to comply with Domain Protection's wishes. Sea Wasp did not comply.  Moreover, Sea Wasp's purported defense under ICANN's Accreditation Agreement has failed.  Thus, absent consent, a court order, or an administrative order, pursuant to ¶ 3 of ICANN's UDRP, Sea Wasp lacked authority to acquire and exercise control over the Domain Names by placing an executive lock on them.  Sea Wasp accordingly unlawfully appropriated Domain Protection's Domain Names.  *See* 4 TEX. PENAL CODE § 31.03(b)(1) (Vernon Supp. 2014).

Further, it is readily apparent that Sea Wasp intended to unlawfully appropriate the property.  "Deprive," as defined by TEX. PENAL CODE § 31.01, means: "to withhold property from

the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner." All that is required for a TTLA action is *intent* to deprive. Here, Sea Wasp judicially admitted that it was appropriating Domain Protection's Domain Names and would not return them until a court of law intervened. *See* Dkt. #14 ("Due to its knowledge of the present ownership dispute, Sea Wasp is maintaining an "executive lock" on the names, which prevents transfer and sale of the names by the registrant, *i.e.*, Plaintiff. Sea Wasp will not remove the lock absent a court order, which would shield Sea Wasp from potential claims by other parties claiming an ownership interest in the names."). The fact that the Court intervened and ordered a preliminary injunction thus preventing the time period from extending does not preclude Sea Wasp's liability. A TTLA action requires *intent* to deprive, not that the theft *actually* resulted in a deprivation for an extended period of time. *See* TEX. PENAL CODE § 31.01. Moreover, the fact that Sea Wasp purportedly appropriated Domain Protection's Domain Names pursuant to "legal advice" (Dkt. #319) is inapposite. First, Sea Wasp cites no authority stating that it may act upon advice of counsel free from fear of any liability for theft. Second, Sea Wasp did not raise this argument in any of its briefing regarding Domain Protection's Motion for Partial Summary Judgment. As the Court has previously stated in this case, there is no reason why Sea Wasp could not have raised this argument in its Response. *See BHL Boresight, Inc. v. Geo-Streering Sols, Inc.*, 4:15-cv-00627, 2017 WL 3634215, at *2 (S.D. Tex. Aug.24, 2017) (quoting *Branch v. CEMEX, Inc.*, No. H-11-1953, 2012 WL 2357280, at 9 (S.D. Tex. Apr. 28, 2015) (explaining that surreplies are "'limited to addressing only new arguments raised for the first time by the opposing party in their reply briefing and not included in the original motion'"). By raising this argument in its late-filed surreply, for the first time, Domain Protection has not been able to respond, which would make it unfair for the Court to consider now. *See TCGC IP Holdings, LLC v. Graves Golf*

*Academy*, No. 3:10-cv-0055-L, 2010 WL 2671302, at *2 (N.D. Tex. July 1, 2010) (citing *Spring Indus., Inc. v. American Motorists Ins.*, 137 F.R.D. 238, 239 (N.D. Tex. 1991)) ("The court declines to consider new arguments and evidence filed for the first time in a reply when there is no chance for the [opposing party] to respond."). Irrespective of Sea Wasp's new arguments, the record is abundantly clear. *See McGee*, 774 S.W.2d at 234. Sea Wasp entered into the DNS Server and purposefully changed records. Sea Wasp placed an executive lock on Domain Protection's Domain Names and thus prevented Domain Protection from controlling its assets. And Sea Wasp judicially admitted that it would not alter the consequences of its actions and return Domain Protection's property to Domain Protection until a court intervened. Sea Wasp knew full well how its actions would affect Domain Protection. To be sure, Sea Wasp itself stated:

> Domain Protection cannot transfer or sell the domain names; it cannot use any of the domain names; it cannot change the name servers; it cannot change the registrant information in the WHOIS database; it cannot manage the monetization of the domain names; it cannot access the revenue generated by the monetization of the domain names; and perhaps most significantly, it cannot remove the executive lock. By contrast, Sea Wasp can exclusively take any or all of these actions based on its ability to control and implement the executive lock.

(Dkt. #105). Sea Wasp knew that its actions in purposefully appropriating Domain Protection's Domain Names would affect Domain Protection's ability to control those Domain Names; Sea Wasp appropriated the Domain Names anyway. Thus, having found intent both from Sea Wasp's admissions and its conduct, *McGee*, 774 S.W.2d at 234, the Court considers whether any damages resulted from Sea Wasp's actions.

The damages in this action are readily apparent. The record reflects that, while an executive lock is on the Domain Names, Domain Protection is not permitted to change its registration records, transfer the Domain Names, or otherwise monetize the names. *See* Dkt. #105 ("The lock prevents Domain Protection from using, selling, or transferring the domain names."). By placing an executive lock on the Domain Names, Sea Wasp has prevented Domain Protection

from updating the registration information affiliated with the Domain Names. Thus, even though Domain Protection contracted with a new Advertising Manager, Domain Protection was unable— prior to the Court's Order entering a preliminary injunction (Dkt. #192)—to access its traffic data and emails without the aid of a third party with whom Domain Protection had terminated its business relationship with. As Sea Wasp itself judicially admitted, and it bears repeating, in its Response in Opposition to Cross-Defendant's Motion to Dismiss Interpleader:

> Domain Protection cannot transfer or sell the domain names; it cannot use any of the domain names; it cannot change the name servers; it cannot change the registrant information in the WHOIS database; it cannot manage the monetization of the domain names; it cannot access the revenue generated by the monetization of the domain names; and perhaps most significantly, it cannot remove the executive lock. By contrast, Sea Wasp can exclusively take any or all of these actions based on its ability to control and implement the executive lock.

(Dkt. #105). This has resulted in the expiration of thousands of unique Domain Names which have been permanently lost (Dkt. #123, Exhibit 151).[17]

The Court finds that there are no genuine issues of material fact and that Domain Protection has carried its burden in establishing each element under the Texas Theft Liability Act such that Domain Protection is entitled to judgment as a matter of law. The Court therefore grants Domain Protection summary judgment on its claim for Sea Wasp's violation of the Texas Theft Liability Act.

---

[17] Sea Wasp avers that Katz has "not taken substantive actions to sell the bulk of the portfolio of names, transfer them to a new registrar, or monetize their cash flow. It appears as if there was a great clamor for judicial relief, but little follow-up" (Dkt. #319). Sea Wasp argues this to show that there are no damages. This argument is merely smoke and mirrors. What Katz and Domain Protection do with the Domain Names after the executive lock is lifted is inapposite. For the time that the DNS Server was altered, and the executive lock was placed, Domain Protection was unable to control its property or profit off of it. Damages, as the Court has already stated, are readily apparent from these facts and thus this novel, and untimely, argument is accordingly rejected.

b. Tortious Interference

Under Texas law, tortious interference with an existing contract occurs when the following elements are satisfied:

(1) an existing contract subject to interference;
(2) a willful and intentional act of interference with the contract;
(3) that proximately caused the plaintiff's injury; and
(4) caused actual damages or loss.

*Texas Integrated Conveyor Systems, Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 366–67 (Tex. App.—Dallas 2009, pet. denied) (citing *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Holloway v. Skinner*, 898 S.W.2d 793, 795–96 (Tex. 1995); *Juliette Fowler Homes*, 793 S.W.2d 660, 664 (Tex. 1990); *Armendariz v. Mora*, 553 S.W.2d 400, 404 (Tex. Civ. App.—El Paso 1977, writ ref'd n.r.e.).  To be legally capable of tortious interference, the defendant must be a stranger to the contract with which he allegedly interfered."

*Community Health Systems Professional Services Corporation v. Hansen*, 525 S.W.3d 671, 690 (Tex. 2017) (citing *Holloway*, 898 S.W.2d at 795–96).  For tortious interference with a prospective contract, a plaintiff must establish:

(1) a reasonable probability that the parties would have entered into a business relationship;
(2) an intentional, malicious intervention or an independently tortious or unlawful act performed by the defendant with a conscious desire to prevent the relationship from occurring or with knowledge that the interference was certain or substantially likely to occur as a result of its conduct;
(3) a lack of privilege or justification for the defendant's actions; and
(4) actual harm or damages suffered by the plaintiff as a result of the defendant's interference, i.e., the defendant's actions prevented the relationship from occurring [and was the proximate cause of that consequence].

*Tex. Integrated Conveyor Syst.*, 300 S.W.3d at 366–67 (citing *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 590 (Tex. App.—Austin 2007, pet. denied); *Bradford v. Vento*, 48 S.W.3d 749, 757 (Tex. 2001) (agreeing with appellate court's analysis of issue)).  "Texas law recognizes that interference which makes performance more burdensome or

difficult, or of less or no value to the one entitled to performance, may constitute an actionable tort." *Hughes v. Houston Northwest Medical Center, Inc.*, 680 S.W.2d 838 (Tex. Civ. App.—Houston [1st Dist] 1984, writ ref'd n.r.e.) (citing *Tippett v. Hart*, 497 S.W.2d 606 (Tex. Civ. App.—Amarillo), *writ ref'd n.r.e. per curiam,* 501 S.W.2d 874 (Tex. 1973)). Finally, "[i]ntentional interference does not require intent to injure, only that 'the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it.'" *Hansen*, 525 S.W.3d at 690 (quoting *Sw. Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992)).

Here, Lisa Katz, on behalf of Domain Protection, "explained to Sea Wasp that [she] had pending contracts and contracts under negotiation" (Dkt. #123, Exhibit 151). These contracts and pending contracts included contracts "to receive advertising revenue from [Domain Protection's] domain names" and prospective contracts to "sell domain names and [] receive cash purchase offers" (Dkt. #123, Exhibit 151). In response, Katz was told by Sea Wasp's representative that "the purpose of the lock was to prevent those sales" (Dkt. #123, Exhibit 151). With those facts in mind, the Court will address Domain Protection's claim for tortious interference of an existing contract first, then consider Domain Protection's claim for tortious interference of a prospective contract.

i. Tortious Interference – Existing Contract

At the outset, it is undisputed that Domain Protection is a party to, at a minimum, one contract through which Domain Protection receives advertising revenue from its domain names (Dkt. #123, Exhibit 151).[18] *Tex. Integrated Conveyor Syst.*, 300 S.W.3d at 366–67. Sea Wasp was not a party to said contract(s) (Dkt. #123, Exhibit 151). Accordingly, Sea Wasp was, and still

---

[18] The existence of said advertising contract has been a recurring claim throughout this litigation which Sea Wasp has not disputed.

is, a stranger, third-party capable of interfering with Domain Protection's contractual rights. *Hansen*, 525 S.W.3d at 690. Next, it is undisputed—indeed, Sea Wasp failed to rebut Katz' Declaration and provide an assertion to the contrary—that Katz was told by Sea Wasp that the purpose of the executive lock was to prevent the contractual sales and monetization of the Domain Names (Dkt. #123, Exhibit 151). *See Tex. Integrated Conveyor Syst.*, 300 S.W.3d at 366–67. As such, Sea Wasp's undisputed intent to prevent fulfillment of an existing contract is readily apparent. This interference has "caused Domain Protection to lose all of its advertising revenue, and irreparably lose sales contracted for" (Dkt. #123, Exhibit 151). Again, Sea Wasp's judicial admissions in Dkt. #105 as discussed in Part III(a), *supra*, corroborate that Sea Wasp was the direct cause of Domain Protection's inability to monetize the Domain Names, access the revenue generated by the monetization of the Domain Names from its existing contract, or manage the Domain Names in any other manner (Dkt. #105). Sea Wasp does not dispute the material facts supporting Domain Protection's tortious interference claim. Further, the Court finds that Sea Wasp's judicial admissions and conduct support each element's fulfillment and that Domain Protection has successfully carried its burden of proof under Rule 56(a). The Court therefore grants Domain Protection summary judgment on its claim of tortious interference with an existing contract against Sea Wasp. *See Tex. Integrated Conveyor Syst.*, 300 S.W.3d at 366–67.

ii. Tortious Interference – Prospective Contract

To prove tortious interference with a prospective contract, Domain Protection must first prove "a reasonable probability that the parties would have entered into a business relationship." *See Tex. Integrated Conveyor Syst.*, 300 S.W.3d at 366–67. This burden does not require that Domain Protection prove that a contract would have been entered into but for Sea Wasp's interference, but it does require that Domain Protection prove the "reasonable probability" of the

formation of a contract.  *See Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 475–76 (Tex. App.—Houston [1st Dist.] 2006, pet. denied); *Suprise v. DeKock*, 84 S.W.3d 378, 382 (Tex. App.—Corpus Christi 2002, no pet.); *Hill v. Heritage Res.*, 964 S.W.2d 89, 115 (Tex. App.—El Paso 1997, pet. denied).  Domain Protection accordingly must prove more than the fact that mere negotiations such as a preliminary firm offer have occurred.  *See Richardson-Eagle*, 213 S.W.3d at 475 ("To establish a claim for tortious interference, a plaintiff must prove that more than mere negotiations occurred.") (citing *Milam v. Nat'l Ins. Crime Bureau*, 989 S.W.2d 126, 132 (Tex. App.—San Antonio 1999, no pet.); *Caller–Times Publ'g Co. v. Triad Commc'ns, Inc.*, 855 S.W.2d 18, 24 (Tex. App.—Corpus Christi 1993, no writ)).  Katz' Declaration merely claims that Domain Protection was "negotiating" future contracts, that a firm offer occurred, and that Domain Protection "was unable to continue *negotiations* because of Sea Wasp's interference" (Dkt. #123, Exhibit 151) (emphasis added).  Katz' Declaration does not provide sufficient facts and circumstances that point to a reasonable probability that the contract would have been consummated.  *See Richardson-Eagle*, 213 S.W.3d at 475.  To be sure, Katz' Declaration admits that further negotiations would have occurred when Katz' herself states that Domain Protection "was unable to *continue negotiations*" (Dkt. #123, Exhibit 151) (emphasis added).  Without more, Domain Protection has failed to carry its burden in establishing the first element of tortious interference with a prospective contract.  The Court simply cannot find a reasonable probability that a contract would have been entered into in the midst of an admittedly ongoing negotiation process.  *See Richardson-Eagle*, 213 S.W.3d at 475.  Consequently, Domain Protection has not

established that it is entitled to judgment as a matter of law under its claim for tortious interference with a prospective contract.

### c. Conversion

Under Texas tort law, "[c]onversion is the wrongful exercise of dominion or control over the property of another in denial of, or inconsistent with, the other's rights in the property." *Robinson v. Nat'l Autotech, Inc.*, 117 S.W.3d 37, 40 (Tex. App.—Dallas 2003, no pet) (citing *Morey v. Page*, 802 S.W.2d 779, 786 (Tex. App.—Dallas 1990, no writ); *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 446 (Tex. 1971)).  To establish a claim for conversion, a plaintiff must prove that:

> (1) the plaintiff owned or had possession of the property or entitlement to possession;
> (2) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner;[19]
> (3) the plaintiff demanded return of the property; and
> (4) the defendant refused to return the property.[20]

*Tex. Integrated Conveyor Syst.*, 300 S.W.3d at 366–67 (citing *Khorshid, Inc. v. Christian*, 257 S.W.3d 748, 759 (Tex. App.—Dallas 2008, no pet.).  The plaintiff must also establish that the defendant's conversion was the proximate cause of the plaintiff's injury.  *See Cypress Creek EMS*, 548 S.W.3d at 685; *United Mobile Networks, L.P. v. Deaton*, 939 S.W.2d 146, 147–48 (Tex. 1997); *MJS & Assocs. v. Master*, 501 S.W.3d 751, 757 (Tex. App.—Tyler 2016, pet. denied).  Much like possession for the Texas Theft Liability Act, a plaintiff may pursue a conversion action when the plaintiff either owned, possessed, or had the right of immediate possession to the property in

---

[19] Any act which interferes with a plaintiff's right to his or her property such that the plaintiff owner cannot freely use and enjoy his or her property constitutes dominion and control.  *See Cypress Creek EMS v. Dolcefino*, 548 S.W.3d 673, 684–85 (Tex. App.—Houston [1st Dist.] 2018, pet. denied); *Pierson v. GFH Fin. Servs.*, 829 S.W.2d 311, 314 (Tex. App.—Austin 1992, no writ).

[20] "[F]ormal demand and refusal are not necessary when the circumstances and the acts of the possessor authorize a finding . . . of a clear repudiation of the owner's rights and are tantamount to a refusal after demand."  *Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 651 (5th Cir. 1991) (quoting *Loomis v. Sharp*, 519 S.W.2d 955, 958 (Tex. Civ. App.—Texarkana 1975, writ dism'd)).

question. *See, e.g.*, *Great W. Drilling, Ltd. v. Alexander*, 305 S.W.3d 688, 695 (Tex. App.—Eastland 2009, no pet.); *Almance v. Shipley Bros.*, 247 S.W.3d 252, 254 (Tex. App.—El Paso 2007, no pet.); *FCLT Loans, L.P. v. Estate of Bracher*, 93 S.W.3d 469, 482 (Tex. App.—Houston [14th Dist.] 2002, no pet.); *Crutcher v. Continental Nat. Bank*, 884 S.W.2d 884 (Tex. App. El Paso 1994, writ denied); *City of Wichita Falls v. ITT Commercial Fin. Corp.*, 827 S.W.2d 6, 8 (Tex. App.—Fort Worth 1992), *aff'd in part, rev'd in part on other grounds,* 835 S.W.2d 65 (Tex. 1992). Merely establishing the aforementioned elements after demonstrating an interest in some form of property, however, is not always sufficient.

Conversion does not apply to purely intangible property. *See Neles-Jamesbury, Inc. v. Bill's Values*, 974 F. Supp. 979, 982 (S.D. Texas 1997); *see also Forum US, Inc. v. Musselwhite*, 2016 WL 6909297, at \*9 (S.D. Tex. Jan. 22, 2016) (stating that "[t]he majority of Texas courts and the Fifth Circuit have held that, under Texas law, conversion applies only to physical (tangible) property, not to intangible property."). Notwithstanding such limitation of a conversion action, courts have found that there may be conversion of intangible property when "the underlying intangible right has been merged into a document" and "there has been conversion of such document." *Id.* (citation omitted); *Rehak Creative Servs. v. Witt*, 404 S.W.3d 716, 734 (Tex. App.—Houston [14th Dist.] 2013, pet. denied), *disapproved on other grounds*, *In re Lipsky*, 460 S.W.3d 579 (Tex. 2015); *Express One Int'l v. Steinbeck*, 53 S.W.3d 895, 901 (Tex. App.—Dallas 2001, no pet.); *see also Pebble Beach Co. v. Tour 18.1 Ltd.*, 942 F. Supp. 1513, 1569 (S.D. Tex. 1996) (Hittner, J.) ("While conversion generally only applies to tangible property interests, courts have recently relaxed this rule to allow actions for conversion of intangible rights in limited circumstances," "[s]pecifically where the underlying intangible right has been merged into a document."), *aff'd judgment as modified on other grounds*, 155 F.3d 526 (5th Cir. 1998),

*abrogated on other grounds as recognized by Test Masters Educational Services, Inc. v. State Farm Lloyds*, 791 F.3d 561 (5th Cir. 2015). This exception to the exclusion of intangible property has been deemed the "merger exception."[21]  *See Robin Singh Educ. Servs., Inc. v. Test Masters Educ. Servs., Inc.*, 401 S.W.3d 95, 98 (Tex. App.—Houston [14th Dist.] 2011, no pet.). The merger exception has been applied to, among other things, lease documents, *Prewitt v. Branham*, 643 S.W.2d 122, 123 (Tex.1983); confidential customer lists, *Deaton v. United Mobile Networks, L.P.*, 926 S.W.2d 756, 762 (Tex. App.—Texarkana 1996), *rev'd in part on other grounds,* 939 S.W.2d 146 (Tex.1997); and shares of stock, *Watts v. Miles*, 597 S.W.2d 386, 387–88 (Tex. Civ. App.—San Antonio 1980, no writ). At present, domain names have not been included within the merger exception. Yet, notably, both federal and Texas law provide that electronic records are entitled to the same legal effect as paper records. *See* 15 U.S.C. § 7001(a); TEX. BUS. & COM. CODE § 322.007(c).

Before considering whether the elements of conversion have been met, the Court must address a threshold question: whether the property in question here, Domain Protection's Domain Names, constitute property which are subject to an action for conversion. Domain Protection cites *Kremen v. Cohen*, 337 F.3d 1024, 1033–34 (9th Cir. 2003) for the proposition that the Domain Names "fall within this class of property because the registration and control of domain names is merged in electronic nameserver, ("DNS") and "WHOIS" records" (Dkt. #123). *Kremen*, however, is merely persuasive authority. In *Kremen*, the Ninth Circuit determined that although

---

[21] The Southern District, in *Devon Energy Corp. v. Westacott*, has expressed hesitancy in what it deems is an expansion of Texas conversion law. 2011 WL 1157334, at *9 (S.D. Tex. Mar. 24, 2011). The court there, however, did not actually reach the merits of whether the computer files in question could serve as a basis for a conversion action. Notwithstanding the *Westacott* court's hesitancy, Texas law is clear that certain intangible property rights may be merged into documents creating a cause of action for conversion. *See Deaton*, 926 S.W.2d at 762; *Branham*, 643 S.W.2d at 123; *Miles*, 597 S.W.2d at 387–88.

domain names constitute intangible property, they were still subject to conversion. *Id.* at 1029–

1030. In its opinion, the Ninth Circuit first rejected the merger exception when it stated:

> In short, California does not follow the *Restatement*'s strict requirement that some document must actually represent the owner's intangible property right. On the contrary, courts routinely apply the tort to intangibles without inquiring whether they are merged in a document and, while it's often possible to dream up *some* document the intangible is connected to in some fashion, it's seldom one that represents the owner's property interest. To the extent *Olschewski* endorses the strict merger rule, it is against the weight of authority. That rule cannot be squared with a jurisprudence that recognizes conversion of music recordings, radio shows, customer lists, regulatory filings, confidential information and even domain names.

*Id.* at 1033. As evidenced by the Ninth Circuit's reasoning, the Ninth Circuit adopted California's

more fluid view of what constitutes "property." *Id.* at 1031. Accordingly, the Ninth Circuit

rejected, at the outset, a tangibility requirement for conversion altogether. *Id.* at 1031 (citing *Payne*

*v. Elliot*, 54 Cal. 339 (1880) (recognizing conversion of shares because they are "a species of

personal property," not because they are tangible)).

After rejecting a tangibility requirement and, *ipso facto*, the so-called "merger exception,"

however, the Ninth Circuit proceeded with its analysis by stating that, even if California retained

some vestigial merger requirement, the domain names in *Kremen* would still be subject to an action

for conversion. *Id.* at 1033. First, the Ninth Circuit noted that the DNS—or Domain Name

System—is a document, or collection of documents, which associates domain names with

particular computers that are connected to the Internet. *Id.* That document, the Ninth Circuit

continued, bears relation to the domain names stored within it because, should one change the

information that is stored within the electronic database of the DNS, then one also changes the

website people see when they type an associated domain name into their personal computer. *Id.*

at 1034. That the DNS is a collection of documents, rather than a solitary document, did not

change the Ninth Circuit's conclusion. Indeed, despite the fact that data corresponding to one

specific domain name is often spread across multiple documents in the DNS, the Ninth Circuit

held that this architectural mechanism of storage did not prevent a conversion claim. *Id.* To reach this conclusion, the Ninth Circuit analogized to a variety of other intangible property that had qualified as conversion-eligible under the merger exception. *Id.* For example, a share of stock—which has been recognized by a plethora of courts as an intangible property that qualifies under the merger exception—is often evidenced by more than one document. *Id.* Similarly, a customer list, which is also protected intangible property under the merger exception, may be recorded on a single document, multiple documents, or even index cards. *Id.* Yet the manner of recordation of the customer list does not change its status under the merger exception. *Id.* Accordingly, the Ninth Circuit found that, assuming *arguendo* that the merger exception applied in California, Kremen's domain name was protected by conversion. *Id.* at 1035.

While *Kremen* is merely persuasive authority predicated upon California's law of conversion, which recognizes a much more fluid concept of property, *Kremen*'s reasoning behind its alternate holding regarding the merger exception is quite helpful. Domain Protection filed suit due to Sea Wasp's placement of an executive lock on Domain Protection's Domain Names. Those Domain Names, while not themselves tangible, have their correlating information and data stored within the DNS: a document, or collection of documents, which associates domain names with particular computers that are connected to the Internet. Two issues must be addressed before the Court can conclusively state that the DNS' Server enables domain names to fall within the ambit of the merger exception: (1) the fact that the DNS is comprised of a multiplicity of documents; and (2) the fact that the DNS' Server is not itself tangible. First, whether the DNS' architectural mechanisms result in the storage of domain names occurring in a single document or a collection of documents is inapposite. Texas, like California, has recognized confidential customer lists, *see Deaton*, 926 S.W.2d at 762, and shares of stock, *see Miles*, 597 S.W.2d at 387–88, as falling within

the ambit of the merger exception. Like domain names, these forms of intangible property may be duplicated or even simply spread across various documents rather than merely being enshrined within one formal document. That Domain Protection's Domain Names may be spread across a variety of documents within the DNS is accordingly of no concern. The second potential issue is that the document(s) that Domain Protection's Domain Names are stored within—the DNS' Server—is not tangible itself. This presents a fact which is not analogous to a share of stock which is represented by a tangible certificate or a confidential customer list represented by an index card. This minor discrepancy does not preclude Domain Protection's Domain Names from qualifying under the merger exception, however.

Texas courts, in defining, interpreting, and analyzing causes of action for conversion often rely upon the Restatement (Second) of Torts. *See Odeja v. Wal-Mart Stores, Inc.*, 956 S.W.2d 704, 707 (Tex. App.—San Antonio 1997, pet. denied); *Robin Singh Educ. Servs.*, 401 S.W.3d at 104 (Frost, J., concurring). The Restatement does not require that the document in which an intangible is merged into be tangible itself. *See* RESTATEMENT (SECOND) OF TORTS § 242; *see also Kremen*, 337 F.3d at 1034, n.11(concluding that the Restatement does not require intangibles to be merged into a tangible document for the merger exception to apply). As such, while the DNS' structure may not qualify as a document in the traditional sense, the Restatement, which Texas courts rely upon in matters of conversion, provides that non-traditional, electronic documents, are eligible documents under the merger exception. Even if the Restatement provided no guidance, Texas courts have seemingly expanded the definition of "document" to include electronic documents, such as court orders, alongside the more traditional hard-copy form documents. *See In re Davis,* 305 S.W.3d 326, 332–33 (Tex. App.—Houston [14th Dist.] 2010, orig. proceeding) (characterizing a court order available on the Harris County District Clerk's

website in electronic form as a "document"); *see also Robin Singh Educ. Servs.*, 401 S.W.3d at 104 (Frost, J., concurring) (citing *Kremen*, 337 F.3d at 1034, n.11 for the proposition that "section 242 of the Restatement (Second) of Torts, only requires merger into a "document" and that a document can be an electronic record."). Thus, the DNS may qualify as a document for merger-exception purposes.[22]

Having determined that the DNS' architectural mechanisms for storage of domain names constitute documents and that the Domain Names here were merged into that document for purposes of storage and management, the Court must now determine whether there has been conversion of the *document* and not simply the *Domain Names*. *See Pebble Beach*, 942 F. Supp. at 1569. In Defendant Sea Wasp, LLC's Response Opposing Motion for Issuance of Temporary Restraining Order and Temporary Injunction (Dkt. #14), Sea Wasp states:

> Sea Wasp regards an unauthorized change as no change, and therefore elected to re-direct the names to the domain servers in place at the time of purchase, i.e., ns1.dnslink.com et al. Sea Wasp completed the process of restoring the original domain name server association with the Quasar Names on June 15, 2018. The name server identified in the Complaint – Domainpower.com – points directly to the dnslink.com address.

(Dkt. #14). This judicial admission is consistent with the Katz' Declaration which states, more colorfully, albeit, that "Sea Wasp hijacked control over all of Domain Protection's domain names and websites, changing the nameserver records from 'ns1.secure32.com, ns2.secure32.com' to 'ns1.dnslink.com, ns2.dnslink.com' and thereby seizing active control of Domain Protection's domain names and the websites linked to its domain names and redirecting them to 'domainpower.com'" (Dkt. #123, Exhibit 151). Despite Sea Wasp's characterization of its intrusion into DNS records as an attempt to restore the status quo—an argument which the Court

---

[22] The Court is aware that in a predecessor case, *Emke v. Compana, LLC*, 2007 WL 2781661, at *3 (N.D. Tex. Sept. 25, 2007), the Northern District noted, in its choice-of-law analysis, that the difference between California and Texas law would result in a different outcome on the conversion claim over domain names present in that action. The court was not required to consider the merger-exception there, however, which changes the analysis in the present action.

has already rejected, *see* Dkt. #192—such intrusion was undertaken without the consent of Domain Protection. *See* Dkt. #123, Exhibit 151 ("Sea Wasp's freezing of Domain Protection's domain names and changing the DNS records was done without the consent of Domain Protection and contrary to the express instructions from me and Domain Protection."). The Domain Names here are inextricably intertwined with the DNS document(s). The Domain Names have their correlating information and data stored within the DNS. The DNS bears relation to the Domain Names stored within it because Sea Wasp was required to change the information stored within the electronic database of the DNS to change the website users see, and are directed to, when they type an associated Domain Name into their personal computer. Thus, elements one and two of a conversion action have been met. Domain Protection had a possessory interest in the Domain Names. *See Tex. Integrated Conveyor Syst.*, 300 S.W.3d at 366–67; *see also* Part III (a), *supra* (holding that Domain Protection has a possessory interest in the Domain Names). The Domain Names were merged into DNS documents—or, more aptly, the DNS' Server. *Id.* And Sea Wasp, "unlawfully and without authorization" assumed control of the DNS' Server, exercised that control by redirecting the Domain Names, and thus precluded Domain Protection's ability to access its Domain Name information, data, records, emails, and other proprietary information which is collected by the DNS Server. *Id.* By acting in this manner, Sea Wasp wrongfully, and without authorization, exercised clear dominion and control—as Sea Wasp has admitted in Dkt. #14—over Domain Protection's Domain Names. *See Cypress Creek EMS*, 548 S.W.3d at 685; *Pierson*, 829 S.W.2d at 314.

As to elements three and four, the record reflects that Domain Protection requested that Sea Wasp remove the lock and that Sea Wasp refused. *See* Dkt. #123, Exhibit 151 ("Domain Protection requested that Sea Wasp return control of its domain names, and restore the DNS

records. Sea Wasp refused to return the assets."); *see also* Dkt. #14 ("Due to its knowledge of the present ownership dispute, Sea Wasp is maintaining an "executive lock" on the names, which prevents transfer and sale of the names by the registrant, *i.e.*, Plaintiff. Sea Wasp will not remove the lock absent a court order, which would shield Sea Wasp from potential claims by other parties claiming an ownership interest in the names."). Sea Wasp does not dispute that such request and denial occurred.[23] *See Fontenot*, 780 F.2d at 1194. Further, any attempt to argue that Sea Wasp was permitted to refuse to deliver the Domain Names back to Domain Protection is defeated by the Court's conclusion that Sea Wasp was not permitted to intervene in the first place.[24] *See* Part II (b), *supra*.

Finally, as to proximate cause, Sea Wasp itself judicially admits in its Response in Opposition to Cross-Defendant's Motion to Dismiss Interpleader (Dkt. #105) that its actions caused Domain Protection to lose control over its Domain Names. *See* Dkt. #105 ("Sea Wasp recognizes that Domain Protection would be in factual possession of the domain names but for the executive lock placed on the names by Sea Wasp."). Further, the Court has already found that Sea Wasp is the actual and proximate cause of Domain Protection's damages as it is undisputed that Sea Wasp placed an executive lock on Domain Protection's Domain Names and interfered with

---

[23] Notably, Sea Wasp could have attempted to make a "qualified refusal" argument in its Response to Domain Protection, LLC's First Motion for Partial Summary Judgment (Dkt. #168) like it did in its Response in Opposition to Cross-Defendant's Motion to Dismiss Interpleader (Dkt. #105). *See Smith v. Maximum Racing, Inc.*, 136 S.W.3d 337, 343 (Tex. App.—Austin 2004, no pet.). Under this argument, had Sea Wasp demonstrated that its refusal was not absolute but rather qualified by "certain conditions which [were] reasonable and justifiable, and which [were] imposed in good faith, and in recognition of the rights of plaintiff," Sea Wasp would not have been liable for conversion. *Id.* Sea Wasp did not make this argument, however. At most, in the TTLA-context, Sea Wasp avers that "Sea Wasp relied upon legal advice regarding what to do since it was on notice of competing claims to the same domain names" (Dkt. #319). This submission was both untimely and insufficient to establish a qualified refusal argument. Moreover, even if Sea Wasp had argued a qualified refusal defense, Sea Wasp was in no position, under ICANN rules, to assert itself into the affairs of Domain Protection in the first place. Thus, this argument would have been rejected even if Sea Wasp had raised it again.

[24] "It is well established under Texas law that acting with good faith or innocence does not constitute a defense to conversion." *Maximum Racing*, 136 S.W.3d at 343 (citing *Rodriguez v. Ortegon*, 616 S.W.2d 946, 949 (Tex. Civ. App.—Corpus Christi 1981, no writ)).

the DNS' Server and Verisign nameserver records. *See* Part III(a), *supra* (discussing the cause of damages). Thus, damages and the proximate cause of those damages are readily apparent. *See Cypress Creek EMS*, 548 S.W.3d at 685; *Deaton*, 939 S.W.2d at 147–48; *MJS & Assocs.*, 501 S.W.3d at 757.

Again, the Court finds that there are no genuine issues of material fact and that Domain Protection has carried its burden in establishing each element of conversion such that Domain Protection is entitled to judgment as a matter of law. The Court therefore grants Domain Protection summary judgment on its claim of conversion against Sea Wasp.

### d. Stored Communications Act

The Stored Communications Act, 18 U.S.C. § 2701(a) (1–2) provides:

> Except as provided in subsection (c) of this section whoever--(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system shall be punished as provided in subsection (b) of this section.

*Id.*[25] The definition of electronic "communication" is found in 18 U.S.C. § 2510.[26] Section 2510(1) defines "wire communication" as:

> any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of such connection in a switching station) furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate or foreign communications or communications affecting interstate or foreign commerce.

*Id.* Section 2510(12) (A–D) defines "electronic communication" as:

> any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce, but does not include--(A)

---

[25] 18 U.S.C. § 2707 provides a civil cause of action for any "provider of electronic communication service, subscriber, or other person aggrieved by any violation of this chapter . . . ."

[26] 18 U.S.C. § 2711(1) states that "the terms defined in section 2510 of this title have, respectively, the definitions given such terms in that section."

any wire or oral communication; (B) any communication made through a tone-only paging device; (C) any communication from a tracking device (as defined in section 3117 of this title); or (D) electronic funds transfer information stored by a financial institution in a communications system used for the electronic storage and transfer of funds.

*Id.* For a defendant to be liable for a violation of the Stored Communications Act, the defendant must "have gained *unauthorized* access to a facility through which electronic communication services are provided (or the access must have exceeded the scope of authority given) and must thereby have accessed electronic communications while in storage." *Garcia v. City of Laredo, Tex.*, 702 F.3d 788, 791 (5th Cir. 2012) (emphasis added). Under the Stored Communications Act, "a person is only liable for accessing content if they are "unauthorized" or "exceed their authorization." *Id.* (quoting 18 U.S.C.A. § 2701(a)). The Act "expressly excepts 'conduct authorized by the person or entity providing a wire or electronic communications service' or 'by a user of that service with respect to a communication of or intended for that user[.]'" *Id.* (quoting 18 U.S.C. § 2701(c)). "Authorized access, in the electronic context, typically involves consideration of 'the expected norms of intended use or the nature of the relationship established' between the holder of the communications and the authorized party." *Bovino v. MacMillan*, 28 F. Supp. 3d 1170, 1176 (D. Colo. 2014) (quoting *U.S. v. Phillips,* 477 F.3d 215, 219 (5th Cir. 2007)). Courts have interpreted the Stored Communications Act to "apply to providers of a communication service such as telephone companies, Internet or e-mail service providers, and bulletin board services." *Garcia*, 702 F.3d at 792 (citing *United States v. Councilman*, 418 F.3d 67, 81–82 (1st Cir. 2005) (en banc); *Theofel v. Farey–Jones*, 359 F.3d 1066, 1075 (9th Cir. 2004); *Steve Jackson Games, Inc. v. United States Secret Service*, 36 F.3d 457, 462–63 (5th Cir. 1994)). As the Fifth Circuit recognized, the Stored Communications Act applies to internet service providers. *Id.*

In Katz' Declaration, Katz' claims that: "On or about June 15, 2018, without notice or authorization from Domain Protection, Sea Wasp accessed the VeriSign electronic registrar

database records for Domain Protection's domain names and changed the nameserver records for all of Domain Protection's domain names" (Dkt. #123, Exhibit 151). Sea Wasp does not dispute Katz' contention and thus the Court takes these facts, again, as undisputed. *See Anderson*, 477 U.S. at 248–49; *Byers*, 209 F.3d at 424. Taking these facts as true, it is readily apparent that Sea Wasp is liable for a violation of the Stored Communications Act under § 2701(a) (1).

Verisign's electronic registry is a database which stores records for domain names. Given that this database enables internet service providers and enables internet navigation by storing signals that provide for such navigation, Verisign's database falls within the ambit of the Stored Communications Act. *See Garcia*, 702 F.3d at 792; *Theofel*, 359 F.3d at 1075; *Steve Jackson Games*, 36 F.3d at 462–63. Sea Wasp accessed Verisign's database, changed the nameserver records for Domain Protection's Domain Names, and, in so doing, accessed an electronic communication while it was being stored in Verisign's storage database. It does well to refresh one's memory on how the domain name system works to understand this conclusion.

To access a website, as the Court has previously stated, a user must connect his or her home computer to the one hosting the site. To achieve this, the user may enter in the website's IP Address—which is a string of numbers which identify the computer where the website is housed—into Internet Explorer or another web browser. *See IP Address*, TECH TERMS COMPUTER DICTIONARY, https://techterms.com/definition/ip_address (last visited November 24, 2019). An IP Address, however, is often difficult to remember. Thus, rather than requiring a user to memorize a string of numbers, website owners often obtain an alpha-numeric "domain name" which users can enter into their browser to access their sought after website. As the Court previously described, an "IP address," is comparable to a nine-digit phone number and a "domain name" is comparable to the name saved on a cell phone for that number. This domain name is stored in an electronic

nameserver record.  Should one change the nameserver record, DNS, or WHOIS records, one also changes the website that the user will access by typing in an associated domain name.[27]  In this sense, the nameserver record and domain name are very much communications.  Like a simple email or phone call, these records and the data they hold communicate from one server to the next to enable a user to connect his or her computer to the hosting site.  Thus, by altering the nameserver records and the underlying Domain Name data, Sea Wasp interfered with a stored electronic communication in violation of the Stored Communications Act.  *See* 18 U.S.C. § 2510(12) (A–D) (defining "electronic communication" as: any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce").

Sea Wasp's actions were intentional.  At the risk of sounding like a broken record, Sea Wasp admitted as such.  In Defendant Sea Wasp, LLC's Response Opposing Motion for Issuance of Temporary Restraining Order and Temporary Injunction (Dkt. #14), Sea Wasp states:

> Sea Wasp regards an unauthorized change as no change, and therefore elected to re-direct the names to the domain servers in place at the time of purchase, i.e., ns1.dnslink.com et al.  Sea Wasp completed the process of restoring the original domain name server association with the Quasar Names on June 15, 2018.  The name server identified in the Complaint – Domainpower.com – points directly to the dnslink.com address.

(Dkt. #14).  Sea Wasp unequivocally states here that it "elected" to "re-direct the names to the domain servers . . . . (Dkt. #14).  In other words, Sea Wasp knowingly and intentionally accessed Verisign to alter records and re-direct electronic communications to another domain name.  In so doing, Sea Wasp essentially locked Domain Protection out of the electronic communication and storage system and thereby prevented Domain Protection from exercising

---

[27] A change in the nameserver record here resulted in a diversion of all website traffic and advertising revenue as well as an inability to receive incoming email associated with the email accounts which correspond with each of Domain Protection's Domain Names.  *See* Dkt. #123, Exhibit 151; Dkt. #105; Dkt. #14.

control over its assets. Sea Wasp knew that Domain Protection was the registrant of these Domain Names; yet, Sea Wasp accessed Verisign and altered the records to these Domain Names regardless. With these actions established, only one element remains to be determined: whether Sea Wasp was authorized under 18 U.S.C. § 2701(c) to access the Verisign nameserver records. As discussed in Part II (b), a registrar is *only* authorized to interfere with a registrant's control over their domain name records when the registrant consents, in writing, or there is a court or administrative panel order directing the registrar to do so. *See* ICANN UDRP ¶ 3. Sea Wasp had not received consent from Domain Protection to alter the Domain Name's nameserver records and was not in possession of a court or administrative panel order. Thus, Sea Wasp lacked the authority to access the electronic communications in this action. *See* 18 U.S.C. § 2701(c); *Phillips,* 477 F.3d at 219.

The Court finds that there are no genuine issues of material fact. Further, Domain Protection has carried its burden in establishing each element of the Stored Communications Act such that Domain Protection is entitled to judgment as a matter of law. The Court therefore grants Domain Protection summary judgment on its claim that Sea Wasp violated 18 U.S.C. § 2701(a)(1).

The Court has found that Sea Wasp lacked the authority to change Domain Protection's Domain Name nameserver records and place an executive lock on the Domain Names. Additionally, the Court has found, after noting that there was no genuine issue of material fact, that Domain Protection has carried its burden in establishing Sea Wasp's liability for: (1) a violation of the Texas Theft Liability Act, (2) tortious interference with existing contract; (3) conversion; and (4) a violation of the Stored Communications Act. The Court accordingly finds that Domain Protection's Motion for Partial Summary Judgment should be granted.

## CONCLUSION

It is therefore **ORDERED** that Plaintiff Domain Protection's First Motion for Partial Summary Judgment (Dkt. #123); Plaintiff Domain Protection's Motion for Leave to File One Page of Sur-Sur-Reply Briefing in Support of its First Motion for Partial Summary Judgment (Dkt. #185); Sea Wasp, LLC's Opposed Motion to Supplement its Response to Plaintiff's First Motion for Partial Summary Judgment (Dkt. #319); and Sea Wasp, LLC's Amended Motion to Supplement its Response to Plaintiff's First Motion for Partial Summary Judgment (Dkt. #327) are hereby **GRANTED**—save the portion of Domain Protection's First Motion for Partial Summary Judgment (Dkt. #123) relating to tortious interference with a prospective contract which is **DENIED**. Sea Wasp is therefore liable for conversion, tortious interference with existing contract, and respective violations of the Texas Theft Liability Act and Stored Communications Act.

**SIGNED** this 12th day of December, 2019.

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE